PARTIDO POPULAR DEMOCRÁTICO y OTROS, demandantes y apelantes, *v.* SERGIO PEÑA CLOS y OTROS, demandados y apelados.

*Número:* AP-95-10          *Resuelto:* 17 de mayo de 1996

*Javier A. Echevarría Vargas*, abogado del apelante; *Arturo González Martín* y *Héctor Aníbal Castro Pérez*, abogados de los apelados.

— O —

Opinión concurrente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se une el Juez Asociado Señor Hernández Denton.

Nos corresponde en esta ocasión delimitar el alcance de la disposición constitucional que garantiza la representación sustancial de los partidos minoritarios en la Asamblea Legislativa, Constitución del Estado Libre Asociado, Art.

III, Sec. 7, L.P.R.A., Tomo 1, y disponer de su efecto en los hechos particulares del caso ante nuestra consideración. Éstos no están en controversia, por haber sido estipulados por las partes durante los procedimientos ante el Tribunal de Primera Instancia. La sentencia que hoy emite el Tribunal revoca el dictamen del foro de instancia y ordena a la Comisión Estatal de Elecciones que certifique al candidato correspondiente para completar la representación de la minoría en el Senado. Por los fundamentos que a continuación esbozamos, concurrimos con dicho curso decisorio. Veamos.

## I

En las elecciones generales celebradas en Puerto Rico el 3 de noviembre de 1992, el Partido Nuevo Progresista (en adelante P.N.P.) obtuvo veinte (20) escaños senatoriales. Los otros dos (2) partidos políticos que presentaron candidatos al Senado, el Partido Popular Democrático (en adelante P.P.D.) y el Partido Independentista Puertorriqueño (en adelante P.I.P.), completaron los veintisiete (27) escaños de los que ordinariamente está compuesto el Senado; seis (6) correspondieron al P.P.D. y uno (1) al P.I.P. Así, el P.N.P. obtuvo más de dos terceras (2/3) partes de los escaños senatoriales. Sin embargo, en relación con el cargo de Gobernador, el candidato propuesto por el P.N.P., Hon. Pedro Rosselló González, obtuvo menos de dos terceras (2/3) partes de todos los votos emitidos para dicho cargo. Como producto de estos resultados se activó la disposición constitucional que garantiza la representación de partidos de minoría a la Asamblea Legislativa, contenida en el inciso (a) de la Sec. 7 del Art. III de la Constitución del Estado Libre Asociado, *supra*.[1] A su tenor, y a base de lo dispuesto en el Art. 6.012 de la Ley Electoral de Puerto Rico,

---

[1] Para fines de claridad, en lo sucesivo nos referiremos a esta disposición como Sección 7.

Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A sec. 3272), la Comisión Estatal de Elecciones (en adelante C.E.E.) procedió a declarar electos y certificar como Senadores a los Lcdos. Eudaldo Báez Galib y Sergio Peña Clos, ambos candidatos por el P.P.D.[2] El licenciado Peña Clos oportunamente prestó juramento y tomó posesión de su cargo. Como miembro del P.P.D., formaba parte de la representación de las minorías al Senado de Puerto Rico.

Así las cosas, el 12 de octubre de 1993 el Senador Peña Clos notificó al Senador Miguel Hernández Agosto, entonces presidente del P.P.D. y portavoz del *caucus* de dicho partido en el Senado, y al Senador Roberto Rexach Benítez, Presidente del Senado de Puerto Rico, que había decidido abandonar el *caucus* del P.P.D. Desde ese momento hasta el 3 de abril de 1995, el Senador Peña Clos se identificó como Senador independiente, desafiliado de todo partido político. En esta última fecha, sin embargo, el Senador Peña Clos ingresó oficialmente al P.N.P.

Desde ese momento hasta el presente, la composición del Senado es la siguiente: veintiún (21) escaños ocupados por Senadores afiliados al P.N.P.; siete (7) escaños correspondientes a Senadores del P.P.D., y un (1) escaño ocupado por un Senador del P.I.P. Al el Senador Peña Clos afiliarse al P.N.P., la representación de partidos de minoría al Senado de Puerto Rico se redujo de nueve (9) Senadores a ocho (8).

El 6 de febrero de 1995 el P.P.D. y los siete (7) Senadores afiliados a dicho partido político[3] presentaron la demanda que da paso a este recurso. En síntesis, los demandantes

---

[2] El Partido Independentista Puertorriqueño (en adelante P.I.P.) no se benefició de las disposiciones legales sobre representación de las minorías. A base de la fórmula establecida por el legislador para ejecutar el mandato de la referida Sección 7, contenida en el Art. 6.012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3272, el P.I.P. tenía sólo derecho a un candidato. Quedó satisfecho dicho mandato con la elección directa del Lcdo. Rubén Berríos Martínez, como Senador por acumulación.

[3] Los Senadores demandantes en este caso son los siguientes: Miguel Hernández Agosto, Antonio Fas Alzamora, Velda González, Marcos Rigau, Cirilo Tirado, Mercedes Otero y Eudaldo Báez Galib.

solicitaron: (1) que se le ordenara al Senador Peña Clos que cesara de desempeñar el cargo legislativo; (2) al Presidente del Senado, que cesara de reconocerle a dicho Senador las prerrogativas propias de un Senador; (3) a la Secretaria del Senado, que eliminara el nombre del Senador Peña Clos de los documentos oficiales del Senado; (4) al macero del Senado, que impidiera al Senador tomar parte en las actividades que de ordinario desempeñan dichos legisladores, y (5) que se declarara que, de conformidad con el mandato de la Sección 7, el P.P.D. tenía derecho a que se certificara un Senador adicional de su colectividad para elevar el número de Senadores por dicho partido de minoría a ocho (8). En este respecto solicitaron también que se le permitiera al P.P.D. certificar al candidato que habría de ocupar dicho escaño.

En instancia, tanto las partes como el tribunal estuvieron de acuerdo con que el caso planteaba exclusivamente una controversia de derecho. Una vez fueron presentados los escritos correspondientes, el caso se dio por sometido. El tribunal de instancia dictó sentencia en la que declaró sin lugar la demanda, dictamen que fue revocado mediante la sentencia que hoy emite el Tribunal. Concurrimos con dicho dictamen. Veamos.

## II

En este caso los demandantes reclaman la concesión de un remedio al amparo de la garantía que establece la Sección 7 en cuanto a la representación de los partidos minoritarios en la Asamblea Legislativa. Como paso previo a cualquier análisis de los méritos del caso y a pesar de que no fue planteado por las partes, debemos analizar sus hechos a la luz del principio de justiciabilidad en cuanto a las doctrinas de legitimación activa, academicidad y cuestión política. Éste es un asunto que es inherente al ejercicio de los poderes conferidos al Poder Judicial dentro de nuestro

sistema republicano de gobierno. La autoridad para analizar los aspectos relacionados a la justiciabilidad de las causas "nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–559 (1958).

Los tribunales nos imponemos las limitaciones que emanan de estas doctrinas para, entre otras cosas, observar y garantizar el justo balance que se requiere de las distintas ramas de gobierno en la administración de la cosa pública. El análisis de este principio es, por lo tanto, un imperativo necesario dentro de nuestro sistema de separación de poderes. Las limitaciones que surgen de éste imponen "un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad". *E.L.A. v. Aguayo*, supra, pág. 597. De ahí que la aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determine la jurisdicción de los tribunales, particularmente en relación con las controversias que se le presentan al amparo de los derechos que garantiza nuestra Constitución. Se trata, pues, de una cuestión de umbral que debemos analizar ante la controversia que nos ocupa.

A. La doctrina mediante la cual se ausculta la legitimación activa de un reclamante ha sido sostenida por nuestra jurisprudencia como uno de los ingredientes necesarios para establecer la jurisdicción de los tribunales en consideración con los principios de justiciabilidad. Reiteradamente hemos señalado que tiene legitimación activa una parte que cumpla con los requisitos siguientes: (1) la parte que reclama debe haber sufrido un daño claro y palpable; (2) el daño debe ser real, inmediato y preciso, no abstracto o hipotético; (3) debe existir una relación causal razonable

entre la acción que se ejercita y el daño alegado; (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley. Véase *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995), y casos allí citados. En síntesis, los requisitos para establecer la existencia de legitimación activa se refieren a la presencia de un daño real, una causalidad y reparabilidad del daño al amparo de la Constitución o de alguna ley. En el análisis se sigue una interpretación liberal de los requisitos de suerte que no le cerremos las puertas a personas y a entidades "que presenten reclamaciones que pueden ser debidamente atendidas por el foro judicial". *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 564 (1989). La determinación se centra principalmente en la persona que promueve la acción y secundariamente en las cuestiones a adjudicarse.

Con relación a los partidos políticos, al igual que cualquier otra entidad con personalidad jurídica para comparecer a los tribunales,(4) se les reconoce legitimación activa por sí, cuando cumplen con todos los requisitos enumerados.(5)

A los legisladores que comparecen a los tribunales en su carácter oficial, por su parte, se les reconoce legitimación activa cuando mediante la reclamación que presentan buscan vindicar sus prerrogativas legislativas. En estos casos el centro de atención debe recaer sobre las facultades del legislador en sus funciones oficiales, cuestión que se refiere específicamente a "la garantía que tiene todo legislador a ejercitar plenamente su derecho constitucional a legislar comprendido en el Art. III, Sec. 1 de la Constitución del

---

(4) "Para que haya 'acción legitimada' tiene siempre que existir la 'capacidad para demandar'." R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 132. Véase, además, *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 563 (1989).

(5) Cuando la organización comparece a los tribunales para reclamar los derechos de sus miembros o integrantes, los criterios que se aplican para determinar su legitimación son distintos. Por no ser pertinentes a los hechos de este caso, no los discutiremos aquí. Para un análisis de estos requisitos, véase *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528 (1994).

Estado Libre Asociado, L.P.R.A., Tomo 1". *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593, 601 (1992). Para sostener su legitimación, el legislador debe cumplir igualmente con los requisitos enumerados anteriormente.([6]) En relación con la determinación de legitimación activa de los legisladores, particularmente se trata de evitar que éstos traten de reproducir el debate legislativo en el recinto judicial.

Cuando la pretensión de legitimación activa de un legislador se fundamenta en que se le está impidiendo fiscalizar adecuadamente la gestión legislativa, debe recordarse que la gestión fiscalizadora del legislador implica sólo "los mecanismos razonables y necesarios que hagan viables su participación plena en todas las etapas críticas del proceso legislativo". *Hernández Torres v. Hernández Colón et al.*, supra, pág. 602. Así, se ve mermada la facultad fiscalizadora del legislador cuando, por ejemplo, se le impide parcial o totalmente participar de forma efectiva en el quehacer legislativo.

Al aplicar los principios normativos esbozados en relación con los demandantes del caso de autos, debemos concluir que todos ostentan la legitimación activa. El análisis debe quedar enmarcado en las disposiciones legales al amparo de las cuales los demandantes presentan sus reclamos: la Sec. 7, que establece un mecanismo para que se le garantice a los partidos de minoría una representación sustancial en la Asamblea Legislativa, y el citado Art. 6.012 de la Ley Electoral de Puerto Rico que establece la fórmula mediante la cual se pone en vigor dicha disposición constitucional.

La referida disposición constitucional dispone, en lo pertinente, que:

---

([6]) Para un análisis más a fondo sobre la legitimación activa de los legisladores y una enumeración de las instancias en que le hemos reconocido legitimación activa, véanse: *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992), y *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992).

Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:

a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adicional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.

Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

Para seleccionar los candidatos adicionales de un partido de minoría, en cumplimiento de estas disposiciones, se considerarán, en primer término, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término sus candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos.

Los Senadores y Representantes adicionales cuya elección se declare bajo esta sección serán considerados para todos los fines como Senadores o Representantes por Acumulación.

La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación

que en la presente se provee. L.P.R.A., Tomo 1, ed. 1982, págs. 336–338.

En cumplimiento del mandato contenido en el último párrafo de la Sección 7, la Legislatura aprobó la disposición contenida en el inciso uno (1) del referido Art. 6.012 de la Ley Electoral de Puerto Rico. Esta disposición, por su parte, establece, en lo pertinente, que:

(1) A los efectos de implementar el inciso (a) de [la sección 7 del Artículo III de la Constitución], se hará la determinación de los Senadores o Representantes adicionales que corresponda a cada uno de dichos partidos en la siguiente forma:

(a) Dividiéndose [el] número de votos emitidos para el cargo de Gobernador por cada partido de minoría por el número total de votos depositados para el cargo de Gobernador por todos los partidos de minoría; luego

(b) Multiplicándose el resultado de la anterior división por nueve (9) en el caso de los Senadores, y por diecisiete (17) en el caso de los Representantes; y

(c) Restándose el resultado de la multiplicación que antecede, el [sic] número de Senadores o Representantes que hubiere elegido cada partido de minoría, según el escrutinio general antes referido.

El resultado de esta última operación de resta será el número de Senadores o Representantes adicionales que se adjudicará a cada partido de minoría hasta completarse el número que le corresponda, sin que el total de Senadores o Representantes adjudicados bajo esta fórmula pueda exceder de nueve (9) en el Senado o diecisiete (17) en la Cámara de Representantes. 16 L.P.R.A. sec. 3272(1).

Del texto de las disposiciones reseñadas surge con claridad que el sujeto a quien el Constituyente quiso tutelar directamente fue al partido político e indirectamente a los miembros que formarían parte de la Asamblea Legislativa, como Senadores o Representantes. Claro, el interés objetivo ulterior del Constituyente, garantizar "la expresión de la voluntad del pueblo en el funcionamiento del poder legislativo", rebasa la identidad de los sujetos nombrados en la disposición. Informe Complementario de la Comisión de la Rama Legislativa de la Convención Constituyente de

Puerto Rico 2590 (1951). De ahí que se haya expresado que la "fórmula de garantía a las minorías se ha producido y recomendado por la Comisión [de la Rama Legislativa] como un medio de dar justa interpretación a la voluntad del pueblo y no como una concesión a partidos políticos". Íd., pág. 2596. Los partidos políticos de minoría y sus legisladores son acreedores del derecho cuyo ejercicio promueve la representación sustancial de dichos partidos en la Asamblea Legislativa. A través del ejercicio de este derecho se alcanza el ulterior interés del Constituyente; garantizar la expresión de voluntad del electorado. Éste es el derecho que se ejerce y el correspondiente interés que se promueve mediante el recurso, actualmente ante nuestra consideración. Una vez enmarcada la cuestión de legitimación activa a la luz de las disposiciones legales pertinentes, pasemos a corroborar el cumplimiento de los requisitos reseñados.

Los demandantes en este caso reclaman que la actuación del Senador Peña Clos al desafiliarse del P.P.D., partido de minoría, y afiliarse al P.N.P., partido de mayoría les priva del derecho sobre representación que la Constitución y la ley les confiere. Esto, continúa su argumento, les produce un daño porque merma las prerrogativas sobre representación que dichas disposiciones legales le reconocen en el desarrollo del quehacer legislativo. Particularmente en relación con el P.P.D., le priva del derecho a tener ocho (8) Senadores de su partido en la Asamblea Legislativa, como ante los hechos del presente caso le concede la fórmula contenida en el citado Art. 6.012 de la Ley Electoral de Puerto Rico.[7]

En cuanto a los legisladores, la actuación impugnada logra que la habilidad de éstos para proponer medidas legislativas y fiscalizar las gestiones de la mayoría en la Le-

---

[7] El número citado surge de la aplicación de la referida fórmula. Efectuamos el correspondiente cálculo más adelante en esta opinión concurrente. Véase esc. 30, *infra*.

gislatura se vea disminuida. Por ejemplo, y en cuanto a la fiscalización, la desafiliación del Senador Peña Clos del P.P.D. produjo el efecto inmediato de que el Presidente de dicho cuerpo, Hon. Roberto Rexach Benítez, tuviera que alterar la composición de las comisiones del Senado, de suerte que al P.P.D. se le brindara representación en éstas, esto en cumplimiento con las normas contenidas en nuestra decisión en *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986).[8] Al tener que fungir como miembros de más comisiones senatoriales es lógico concluir que la habilidad que tienen estos legisladores para fiscalizar efectivamente la labor legislativa disminuye.[9] Esto es un daño real, claro y palpable[10] causado a los demandantes por la actuación impugnada. Es claro que una merma en la capacidad de participar efectivamente en la labor que efectúan las comisiones, cuando se tiene derecho a ello, produce un daño

---

[8] Para el 12 de enero de 1993, el Senador Peña Clos había sido nombrado miembro de las Comisiones del Senado siguientes: Comisión de Gobierno, Comisión de Nombramientos, Comisión de Salud y Comisión de Corporaciones Públicas.

El 28 de octubre de 1993 el Senador Peña Clos fue designado miembro de la Comisión de Asuntos Federales y Económicos y de la Comisión de Hacienda.

El 1ro de febrero de 1995 el Presidente del Senado designó a los Senadores del P.P.D., Fas Alzamora y Eudaldo Báez Galib a las Comisiones de Nombramientos y de Corporaciones Públicas, respectivamente. Ambos sustituyeron en ellas al Senador Peña Clos.

El 13 de febrero de 1995 el Senador Peña Clos fue designado miembro de la Comisión de Ética Gubernamental.

Con posterioridad a dicha fecha, los Senadores Roger Iglesias del P.N.P. y Marco Antonio Rigau del P.P.D. fueron nombrados miembros de la Comisión de Gobierno. Por su parte, el nuevo progresista José E. Meléndez y el popular Cirilo Tirado fueron designados a la Comisión de Salud. Todos ellos fueron nombrados en virtud de la R. del S. 1001 que aumentó el número de miembros que componen dichas comisiones.

Como se desprende de esta descripción, el Senado de Puerto Rico siguió dos (2) vías para asegurar la presencia de miembros del P.P.D., partido de minoría, en las distintas comisiones a las que pertenecía el Senador Peña Clos. En la de Nombramientos y la de Corporaciones Públicas, el Senador Peña Clos fue sustituido por Senadores del P.P.D.; en las de Gobierno y de Salud, por otro lado, se aumentó el número de Senadores que las componían y se nombró en éstas a Senadores del P.P.D.

[9] Hemos reconocido la importancia de las comisiones en la función legislativa. En *Silva v. Hernández Agosto*, 118 D.P.R. 45, 67 (1986), expresamos que éstas "constituyen el principal vehículo de fiscalización y legislación de la Rama Legislativa".

[10] El concepto "daño", que se utiliza aquí, se refiere al requisito necesario para establecer la legitimación activa del promovente de la acción, no estamos haciendo alusión al daño que por concepto de indemnización otorgan los tribunales en casos apropiados.

cuyas características satisfacen los requisitos promulgados para la corroboración de la doctrina de legitimación activa.

En relación con los restantes requisitos de la doctrina de legitimación activa, los demandantes solicitan que el Senador Peña Clos deje de desempeñar su cargo y que se les reconozca el derecho de nombrar un senador afiliado al P.P.D. Los demandantes fundamentan su reclamo en las disposiciones constitucionales de la Sección 7. De proceder el reclamo solicitado, o algún otro remedio que tuviera el mismo efecto, claramente se eliminaría la fuente del daño por el que reclaman los demandantes. Se corrobora así el cumplimiento de los demás requisitos enumerados en cuanto a la doctrina de legitimación activa; se cumplen los requisitos de causalidad y de reparabilidad expuestos. Por lo tanto, debemos concluir que los demandantes en el caso de autos tienen legitimación activa.

B. La doctrina de academicidad, por su parte, tiene el mismo efecto que la aplicación de las demás doctrinas relacionadas al principio de justiciabilidad. Es decir, de ser aplicables sus postulados a determinada situación de hechos, el Tribunal podrá autolimitar su función revisora en relación con el asunto que se le presenta. Se dice que "un caso académico ... es 'uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto ... que[,] al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente' ". (Escolio omitido.) *E.L.A. v. Aguayo*, supra, pág. 584. No será académico y, por lo tanto, será justiciable un caso que presente una controversia real, entre partes opuestas, cuando la sentencia que se dicta tiene un efecto práctico.[11] La vir-

---

[11] No analizamos aquí, por no ameritarlo las circunstancias del caso, las instancias de excepción que han desarrollado los tribunales en relación con la doctrina de academicidad. Para un análisis de estas situaciones excepcionales, véanse: *Pueblo v. Ramos Santos*, 138 D.P.R. 810 (1995); *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991).

tualidad que requiere la doctrina de academicidad debe permear todo el proceso judicial del caso, incluso ante los foros apelativos durante los procedimientos en alzada.

En este caso los demandantes, un partido político y los Senadores afiliados a él, reclaman la existencia de un derecho a poder disfrutar de un asiento adicional en el Senado de Puerto Rico durante el actual cuatrienio. Los demandados, por el contrario, niegan la existencia de este derecho. Queda así establecida la corroboración de dos (2) de los requisitos que plantea la doctrina que discutimos; la existencia de una controversia real, entre partes opuestas.

Durante cada cuatrienio la Asamblea Legislativa permanece vigente hasta que los legisladores electos para el próximo cuatrienio prestan juramento y toman oficialmente sus respectivos cargos. Así, dispone nuestra Constitución en su Art. III, Sec. 10, que "[l]a Asamblea Legislativa será un cuerpo con carácter continuo durante el término de su mandato y se reunirá en sesión ordinaria cada año a partir del segundo lunes de enero". L.P.R.A., Tomo 1, ed. 1982, pág. 341. La Sección 8 del mismo articulado de la Constitución dispone, por su parte, que "[e]l término del cargo de los Senadores y Representantes comenzará el día dos de enero inmediatamente siguiente a la fecha en que se celebre la elección general en la cual hayan sido electos". Const. E.L.A., *supra*, pág. 339. De ahí que la duración de la Asamblea Legislativa se extienda hasta que los miembros de la nueva Asamblea Legislativa ocupen sus cargos el mes de enero siguiente a la última elección general.([12])

---

([12]) Los legisladores están, potencial o efectivamente, enfrascados en actividades propias de su cargo hasta que finaliza la Asamblea Legislativa, aún después de haber terminado la última sesión ordinaria del cuatrienio, lo cual mediante ley se ha dispuesto que ocurrirá el 31 de mayo. Sec. 1 de la Ley Núm. 9 de 9 de abril de 1954, según enmendada, 2 L.P.R.A. sec. 1a. Así, por ejemplo: (1) dicho término podrá extenderse mediante resolución conjunta que se apruebe en dicha sesión' ordinaria (Sec. 5 de la Ley Núm. 9, *supra*, según enmendada, 2 L.P.R.A. sec. 205); (2) el Gobernador puede convocar en cualquier momento a sesiones extraordinarias, según lo permite nuestra Constitución en el Art. III, Sec. 10, y en el Art. IV, Sec. 4, L.P.R.A., Tomo 1, y (3) la Asamblea Legislativa tiene siempre la facultad de llevar a cabo

No habiendo finalizado el actual cuatrienio, resulta obvio que se cumplen los requisitos de la doctrina de academicidad. Existe una controversia real entre partes opuestas y se satisface el criterio de practicabilidad.

C. Por último, en esta etapa nos resta evaluar si nuestra intervención con los hechos del caso de autos está impedida en atención con los principios que promulga la doctrina de cuestión política. De todas las doctrinas relacionadas al principio de justiciabilidad, ésta es la que más claramente va unida al propósito citado de guardar el balance en el ejercicio de los poderes constitucionales entre las distintas ramas de gobierno. Aunque la doctrina de cuestión política no ha tenido un fuerte arraigo en nuestra jurisdicción, recientemente tuvimos la oportunidad de sostener la vigencia de sus postulados en nuestro orden constitucional. En *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497, 515 (1994), expresamos que la doctrina de cuestión política "sigue siendo una de las reglas de autolimitación en el ámbito local". Toda determinación de la aplicación de esta doctrina debe hacerse, sin embargo, reconociendo que el Poder Judicial es el intérprete final de la Constitución.

En *Noriega Rodríguez v. Jarabo*, supra, pág. 509, dijimos en cuanto a su alcance que:

[e]specíficamente, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponda a las otras ramas políticas de gobierno o al electorado. Un tribunal se enfrenta a una cuestión política, no susceptible de adjudicación judicial, cuando existe uno de los elementos siguientes: (1) una delegación expresa del asunto en controversia a otra rama de gobierno; (2) ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) imposibilidad de decidir sin hacer una determinación inicial de la política pública

---

procesos de residencia conforme lo dispone la Sec. 21 del Art. III de la Constitución, L.P.R.A., Tomo 1. Además, hemos resuelto expresamente que "[l]os cuerpos legislativos tienen ... la potestad de ordenar a sus respectivas comisiones ... que contin[ú]en sus trabajos hasta el último día de la Asamblea Legislativa, o sea, hasta que los miembros de la nueva Asamblea Legislativa ocupen sus puestos el mes de enero siguiente a la última elección general". *Hernández Agosto v. Ortiz Montes*, 115 D.P.R. 564, 568 (1984).

que no le corresponde a los tribunales; (4) imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos de gobierno sobre un asunto. (Escolio omitido.)

Reiteramos, en este sentido, los criterios originalmente esbozados por el Tribunal Supremo de Estados Unidos en *Baker v. Carr*, 369 U.S. 186 (1962), los cuales son igualmente aplicables en nuestra jurisdicción a la luz de nuestra Constitución.

Las determinaciones a la luz de la doctrina de la cuestión política ameritan un análisis circunstancial pragmático, revestido de la mayor cautela y deferencia a la interpretación que sobre este asunto pueda haber efectuado alguna otra rama de gobierno. No supone de forma alguna, sin embargo, que claudiquemos nuestra función principal dentro de la organización de gobierno bajo la cual vivimos, como intérpretes últimos de los contornos de nuestra Constitución. Después de todo, " '[e]l mero hecho que el pleito bus[que] la protección de un derecho político no quiere decir que el mismo present[e] una cuestión política' ". (Traducción nuestra.) *Baker v. Carr*, supra, pág. 209, citado con aprobación en *Silva v. Hernández Agosto*, supra, pág. 54. Véase, también, *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). A la luz de los principios esbozados, veamos las circunstancias particulares de este caso.

En instancia los demandantes solicitaron, en síntesis, que se le prohibiera al Senador Peña Clos seguir disfrutando de las facultades y ejecutando las responsabilidades propias de su cargo. Solicitaron también que a los demás demandados se les ordenara dejar de reconocerle al Senador sus prerrogativas legislativas. El tribunal sentenciador interpretó que los demandantes pretendían la expulsión de un Senador por Acumulación debidamente juramentado

como tal, mediante fíat judicial. Ante esta situación, desestimó la demanda. Fundamentó su decisión en el reconocimiento de que una vez debidamente juramentados, nuestro ordenamiento no permite distinciones jerárquicas entre la calidad de los Senadores y, por lo tanto, no cabe negarle a uno lo que legalmente se le concede a los demás. Razonó que una vez juramentado, el licenciado Peña Clos advino a Senador por Acumulación para todo propósito, tal cual lo ordena la Constitución,[13] aun cuando su certificación como tal Senador respondiese a las disposiciones constitucionales sobre representación minoritaria. Paso seguido, se refirió a la disposición contenida en el Art. III, Sec. 9 de la Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 340, que prescribe que "[c]ada cámara ... con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21" del Artículo III. Consecuentemente, el tribunal dispuso que "corresponde al Senado de Puerto Rico y no al foro judicial el decidir si debe expulsar o no de su seno al demandado Segio (sic) Peña Clos". Sentencia apelada, pág. 11.

Ahora bien, el análisis de la controversia debe ir más lejos. La Constitución, a la luz de los hechos del caso de autos, así nos lo exige. En instancia los demandantes, además de los requerimientos descritos, solicitaron que el tribunal declarara que "conforme la Sección 7 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, el Partido Popular Democrático tiene derecho a un Senador por adición para llevar el número de sus Senadores durante este cuatrenio (sic) a la cantidad de ocho (8) senadores". Demanda, pág. 4. El tribunal decidió no analizar este planteamiento porque entendió que este dependía

---

[13] A estos efectos la Constitución expresamente dispone que "[l]os Senadores y Representantes adicionales cuya elección se declare bajo ... [la] sección [7 del Artículo III de la Constitución] serán considerados para todos los fines como Senadores o Representantes por Acumulación". Art. III, Sec. 7, Const. E.L.A., *supra,* pág. 338.

de la determinación referente a la procedencia de la expulsión del Senador Peña Clos, pretensión que descartó.

Para fines de lo que discutimos, sin embargo, este planteamiento provee el matiz distintivo que produce la inaplicabilidad de la doctrina de cuestión política. Ante este último planteamiento de los demandantes, debemos en primer orden determinar cuál es el alcance de la disposición constitucional en que se fundamenta su petición. Al hacerlo estamos ejerciendo una facultad que se nos encomendó de forma exclusiva: la interpretación final de las disposiciones de nuestra Constitución. De esta interpretación surgirá si en efecto los demandantes tienen derecho a la certificación de un (1) Senador adicional por parte de su partido político, de suerte que el número de Senadores afiliados al P.P.D. aumente a ocho (8). De existir el derecho reclamado, procede entonces que determinemos el remedio que debemos conceder. En la medida en que este remedio no conflija con las facultades que deben ejercer las otras ramas de gobierno, no estaríamos ante una cuestión política. Estaríamos disponiendo de reclamos que válidamente se nos presentan a base de derechos que provee la Constitución y que pueden ser compelidos mediante una acción judicial. Se trata también de derechos que podrían verse mermados si no interviene el poder judicial. La única limitación que nos impone la doctrina de cuestión política es que el remedio no conflija con las facultades que nuestra Constitución le confiere a otras ramas de gobierno. Enmarcada de esta forma la situación ante nuestra consideración, queda claro que no estamos ante una cuestión política que impida nuestra intervención.

Habiendo determinado que el caso ante nuestra atención cumple con el principio de justiciabilidad, analicemos los méritos de éste.

# III

Nos proponemos determinar el derecho que, a la luz de las particulares circunstancias de este caso, se le debe reconocer a los demandantes bajo la garantía de representación sustancial de partidos de minoría que ofrece la Constitución del Estado Libre Asociado de Puerto Rico. Luego procederemos a delinear el remedio al que, a la luz de la anterior determinación, son acreedores los demandantes. El análisis que nos proponemos efectuar supone, principalmente, que delimitemos el alcance de la Sección 7. Para ello será necesario que, primeramente, auscultemos su naturaleza y contenido. Veamos.

A. Al comenzar el análisis de la referida disposición constitucional estamos conscientes de que "[t]ras casi medio siglo de vigencia de nuestra carta constitucional, situaciones extraordinarias no previstas por el Constituyente han puesto de manifiesto que, en lo que respecta a la consecución de sus propósitos, no existe precedente legislativo o judicial, como tampoco interpretación doctrinal alguna que ofrezca parámetros para determinar el alcance de los efectos prácticos de la fórmula para la representación por adición".[14] No obstante, nuestra función como últimos intérpretes de nuestra Constitución no puede verse impedida por esta falta de precedente. Debemos analizar la referida disposición en todos sus entornos para adjudicar esta controversia.

No es arriesgado decir que entre los delegados a la Convención Constituyente existía un consenso en cuanto a la necesidad de incorporar en la Constitución una garantía para la representación de los partidos de minoría a las cámaras legislativas. Varias proposiciones se presentaron para alcanzar dicho fin. Así, por ejemplo, la delegación so-

---

[14] O. Resumil de Sanfilippo y Faría González, *La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión*, 65 Rev. Jur. U.P.R. 329, 329–330 (1996).

cialista a la Convención Constituyente presentó la Proposición Núm. 94, que contenía disposiciones tendientes a promover dicho fin;(15) la delegación republicana, por su parte, presentó las Proposiciones Núms. 103 y 326, y el delegado señor Muñoz Rivera presentó la Proposición Núm. 316.(16)

Todas estas proposiciones tenían en común varios

---

(15) Véase Academia Puertorriqueña de Jurisprudencia y Legislación, *Proposiciones y Resoluciones de la Convención Constituyente de Puerto Rico, 1951–1952*, San Juan, sin ed., 1992, pág. 182.

(16) J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. U.P.R., 1982, Vol. II, pág. 144. Para el texto de las Proposiciones Núms. 103 y 326, véase *Proposiciones y Resoluciones de la Convención Constituyente de Puerto Rico*, supra, págs. 253–254 y 556–557, respectivamente.

La Proposición Núm. 94 pretendía establecer un Poder Legislativo con un Senado y una Cámara de Representantes; el primero, con veinticuatro (24) miembros, y la segunda, con cuarenta y ocho (48). La sección 3 del Artículo VI, de dicha proposición establecía la garantía a las minorías. Disponía que "[c]ada distrito electoral elegirá tres (3) senadores y seis (6) representantes; pero ningún partido político podrá elegir más de dos (2) senadores, ni más de cuatro (4) representantes, por cada distrito". *Proposiciones y Resoluciones de la Convención Constituyente*, supra, pág. 182.

La Proposición Núm. 103, por su parte, disponía también que la Asamblea Legislativa estuviera compuesta de dos (2) cámaras: el Senado y la Cámara de Representantes. En cuanto al Senado, esta proposición pretendía un mecanismo similar a la citada Proposición Núm. 94; se distinguía de ésta tan sólo en que disponía para le existencia de siete distritos senatoriales, en lugar de ocho (8), con tres (3) senadores por cada distrito. Disponía también que ningún partido podría postular más de dos (2) candidatos por cada uno de los distritos senatoriales. En cuanto a la Cámara de Representantes, la garantía representativa se vislumbraba de una forma sustancialmente distinta. Disponía esta Proposición que la Cámara constaría de un número indeterminado de miembros, considerándose electo todo candidato que obtuviera un mínimo de diez mil (10,000) votos en toda la Isla o en cualquier parte de ella.

La Proposición Núm. 326 también adelantada por los republicanos, disponía que la Asamblea Legislativa estaría compuesta por un Senado y una Cámara de Representantes. El Senado contendría treinta (30) miembros; tres (3) por cada uno (1) de los ocho (8) distritos electorales propuestos y seis (6) por acumulación. En ningún caso un partido político podría postular o elegir más de dos (2) candidatos por cada distrito o más de cuatro (4) por acumulación. En la Cámara se adoptaba igual sistema: cuarenta y cinco (45) miembros; cinco (5) por cada distrito electoral y cinco (5) por acumulación. Ningún partido podría postular o elegir más de cuatro (4) representantes por cada uno (1) de los ocho (8) distritos propuestos o más de tres (3) por acumulación.

La Proposición Núm. 316, presentada por el delegado señor Muñoz Rivera, pretendía asegurar también la representación minoritaria. Disponía para la creación de un Parlamento compuesto por una sola cámara. La Cámara tendría setenta y tres (73) diputados; ocho (8) por cada uno de los ocho (8) distritos propuestos y nueve (9) por acumulación. Ningún partido podría postular o elegir más de siete (7) candidatos por cada distrito, ni más de seis (6) de los diputados por acumulación.

elementos. De éstos, el más revelador para el asunto que discutimos es el mecanismo mediante el cual se implantaría la garantía de representación minoritaria. Todas, con excepción de la Proposición Núm. 326 en lo concerniente a la composición de la Cámara de Representantes, se caracterizaban porque establecían un número fijo del cual estaría compuesta cada cámara y disponían, además, que ningún partido podría postular o escoger más de cierto número de Senadores o Representantes por cada distrito electoral o, en los casos que se proveía para la elección de legisladores por acumulación, entre éstos. El énfasis, por lo tanto, recaía en el número fijo del cual estaría compuesta cada cámara y el número fijo de candidatos propuestos o electos por cada partido de mayoría. Dicho énfasis provocaba necesariamente el aseguramiento de escaños destinados a los representantes de minoría.

Las fórmulas propuestas por estos delegados fueron descartadas. Entre los defectos esgrimidos para ello, dos (2) resaltan: "se le[s] consideraba demasiado mecánica[s] e inflexible[s], ya que simplemente les garantizaba a las minorías, no importa las circunstancias, el control de por lo menos una tercera parte del parlamento; y, en segundo término, no les garantizaba trato justo a los distintos partidos minoritarios, pues permitían que el partido más fuerte de la minoría se adueñase del cupo disponible para ésta." (Escolios omitidos.) J. Trías Monge, *Historia Constitucional de Puerto Rico y Estados Unidos*, San Juan, Ed. U.P.R., 1982, Vol. II, pág. 145,[17] particularmente en relación con la integración del Senado en algunas de estas propuestas, que sólo aseguraba a los partidos de minoría un escaño por distrito.

La disposición propuesta por la Comisión de la Rama Legislativa de la Convención Constituyente recogió la pre-

---

[17] Para el argumento correspondiente véase la discusión del delegado señor Negrón López en relación con varias de estas propuestas. 2 Diario de Sesiones de la Convención Constituyente 1301–1302 (1951).

ocupación de los delegados a la Convención.([18]) Mediante una fórmula diseñada por el Presidente de dicha comisión, el delegado Luis Negrón López se trató de garantizar el referido interés de la forma más eficiente posible sin menoscabar la voluntad del pueblo o producir un sistema que propiciara el fraccionamiento de la fuerza electoral provocando así que la administración de la cuestión pública fuese imposible. Con algunas enmiendas, la propuesta de la Comisión fue eventualmente adoptada por la Convención Constituyente y hoy está en la Sección 7.

En el Informe Complementario de la Comisión de la Rama Legislativa, presentado a la Convención Constituyente el 28 de diciembre de 1951, la Comisión se expresó en cuanto a la disposición propuesta. Los miembros de la Comisión razonaron que:

> ...es posible que una inadecuada distribución de los votos obtenidos por las minorías produzca el resultado indeseable de que su representación en las cámaras no guarde proporción con los votos que obtengan en las urnas. Previendo esta situación la Comisión ha elaborado un plan de representación que garantiza una justa representación a los grupos minoritarios que no la obtengan en razón a los factores señalados. No se ha elaborado este plan a base del principio de representación porporcional, porque entendemos que no es recomendable ni debe adoptarse. El sistema de representación proporcional equivaldría a reproducir en el instrumento legislativo la misma división de criterios que exista en el cuerpo electoral, y con su adopción el proceso democrático no produciría el resultado de fijar la responsabilidad del gobierno en los grupos favorecidos por la opinión pública. Sin embargo, entendemos que la misión fiscalizadora de las minorías no puede cumplirse eficazmente si no hay la garantía de cierto mínimum de representación en pro-

---

([18]) Con el fin de concretizar efectivamente esta preocupación, debemos señalar que reiteradamente se ha dicho que el propósito para adoptar una disposición constitucional que asegurara el derecho de representación de las minorías era evitar, dentro de lo posible, la situación surgida en las elecciones de 1948. En esa ocasión el Partido Popular Democrático acaparó el 94.8% de los escaños legislativos, pero sólo obtuvo el 61.2% del total de los votos emitidos para el cargo de Gobernador. Los partidos de minoría, sin embargo, habiendo logrado el 38.8% de los votos para el cargo de Gobernador, obtuvieron sólo 5.2% del total de los escaños legislativos. J. Trías Monge, *op. cit.*, págs. 143–144.

porción a los votos que las minorías obtengan, consideradas en conjunto. La Comisión entiende que siendo justa y adecuada la división en distritos representativos y senatoriales que se hace en la constitución, y proveyéndose para la elección de un número razonablemente alto de legisladores por acumulación, hay suficiente garantía para que los distintos criterios de opinión pública estén representados en la Asamblea Legislativa. No obstante, para el caso de que esto no resulte así, la Comisión ha recomendado que si un partido o una sola candidatura elige más de dos terceras partes de los miembros de una cámara, se aumente de manera automática la composición de esa cámara para fortalecer la representación minoritaria bajo dos circunstancias distintas: la primera, cuando los partidos de minoría han obtenido más de la tercera parte del voto total emitido para el cargo de Gobernador, en el cual caso el número de miembros de la cámara se aumentará de manera que la representación total de las minorías sea igual a la tercera parte del número original de miembros de dicha cámara. ... Para el aumento de miembros de una cámara en la forma antes dispuesta, el número original de miembros del Senado será siempre veintisiete (27) y el de la Cámara de Representantes cincuenta y uno (51).[19]

De la citada transcripción se puede identificar al menos dos (2) de los elementos que controlaron el ánimo del Constituyente al momento de adoptar la citada disposición constitucional. En primer orden, surge con claridad que fue la intención del Constituyente no restarle efectividad a los esfuerzos que tuviera a bien promover el partido seleccionado por el pueblo como partido mayoritario. Segundo, el Constituyente tuvo la intención de proveerle a los partidos de minoría la oportunidad de representar efectivamente los intereses de los grupos de opinión que encarnan, de suerte que pudiesen efectuar la importante labor de fiscalizar la gestión del Gobierno. Por lo tanto, dispuso para que el mecanismo adoptado aplicase sólo en aquellos casos en que un sólo partido copase más de dos terceras (2/3) partes de los escaños de cualquiera o ambas cámaras legislativas. Así limitaba la injerencia de factores externos

---

[19] Diario de Sesiones, *supra,* Vol. 4, págs. 2595–2596.

a estos casos. Aún en estos casos se aseguró de que el partido así seleccionado por el voto directo del pueblo no perdiera su estado como partido mayoritario. Para ello dispuso que, al aplicar la fórmula, el número de legisladores por el o los partidos de minoría nunca excedería la tercera parte del número original del cual estaba compuesta cada cámara. En el caso del Senado, por lo tanto, la composición de los miembros de partidos de minoría sería nueve (9), en los casos que aplicase la disposición constitucional. Este número constituye el mínimo que se le quiso garantizar a los partidos de minoría.

En cuanto a su contenido específico, la referida Sección 7 de la Constitución provee una fórmula autóctona, calificada como innovadora e, incluso, ingeniosa.[20] En efecto, ninguna de las constituciones estatales o la federal, de Estados Unidos de América, y ninguna constitución de los países latinoamericanos contenía una disposición similar.[21] En esencia, y en lo pertinente, se dispone en la Sección 7:

> ...que cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las Cámaras por un sólo partido, se aumentará el número de los miembros de la Cámara en cuestión declarando electos candidatos del partido o partidos de minoría en número suficiente hasta que el total de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de 17 en la Cámara de Representantes. (Énfasis suprimido.) *Fuster v. Busó*, 102 D.P.R. 327, 332 (1974).

Establece dos (2) fórmulas generales que han de seguirse, dependiendo de la situación, una vez se corrobore la obtención de dos terceras (2/3) partes de los escaños de ambas o cualquiera de las cámaras legislativas por un sólo partido político. En el caso que nos ocupa, la fórmula se

---

[20] Trías Monge, *op. cit.*, pág. 143.

[21] "No existía en realidad precedente exacto para el sistema propuesto por la Comisión de la Rama Legislativa." Trías Monge, *op. cit.*, pág. 145.

relaciona a la situación en que, aun cuando el partido de mayoría obtenga más de dos terceras (2/3) partes de cualquiera o ambas de las cámaras legislativas, obtendrá una relación inferior a las dos terceras (2/3) partes de todos los votos emitidos para el cargo de Gobernador. En estas situaciones la Constitución, en el inciso (a) de la Sec. 7 del Art. III, *supra*, ordena que: (1) se aumente el número de la cámara correspondiente, y (2) se declaren electos los candidatos del partido de minoría en un número suficiente hasta que la totalidad de los miembros de los partidos de minoría alcance el número de nueve (9) en el Senado y diecisiete (17) en la Cámara de Representantes.

En los casos en que existiese más de un partido de minoría, la Constitución dispone unas reglas particulares. Primeramente, se establece que la asignación de escaños adicionales a cada uno de estos partidos guardará relación con la ejecución porcentual que el partido hubiera obtenido en cuanto a todos los votos emitidos para el cargo de Gobernador por los partidos de minoría. Además, la Constitución limita la atribución que concede, en primer orden, a aquellos partidos que hubiesen obtenido una representación en proporción menor a la proporción de votos alcanzada por su candidato a Gobernador.

Para ejecutar la garantía, primeramente se debe seleccionar los candidatos por acumulación para la Cámara de que se trate que no hubiesen resultado electos, en el orden de los votos obtenidos. En segundo lugar, se ordena la selección de los candidatos por los distintos distritos.

En relación con la naturaleza de los legisladores que ocupen sus cargos en virtud de esta disposición constitucional, el Constituyente quiso que fuesen considerados para todos los fines como Senadores o Representantes por Acumulación. Con esta disposición quiso asegurar que no se crease un rango legislativo inferior en cuanto a las responsabilidades y prerrogativas propias del cargo que ocuparía el legislador en virtud de esta disposición

constitucional. Se relaciona, además, a la forma en que habría de sustituirse la vacante surgida en relación con estos cargos, de conformidad con lo dispuesto en la propia Constitución. Art. III, Sec. 8, *supra*.([22])

Por último, el Constituyente dispuso que la Asamblea Legislativa, mediante ley, debería proveer para: (1) la adopción de medidas para reglamentar las garantías; (2) las normas para disponer de las fracciones surgidas en relación con los resultados de las elecciones para fines de disponer los efectos de la garantía, y (3) el número mínimo de votos que un partido político debía obtener para disfrutar de los beneficios de la disposición. De conformidad con la delegación conferida a la Asamblea Legislativa, en la Ley Electoral de Puerto Rico se incluyó el Art. 6.012, que ya hemos citado en su parte pertinente.

De estas disposiciones se desprende la estructura siguiente. Particularmente en relación con el Senado de Puerto Rico, la Constitución establece que su composición original será de veintisiete (27) miembros. De surgir la situación descrita en el inciso (a) de la Sección 7, dicha composición original aumentará automáticamente hasta que la representación de todos los partidos de minoría sea de nueve (9) Senadores. Es dentro de estos parámetros que se aplican las operaciones matemáticas previstas por el Constituyente y reglamentadas por el Legislador.

Finalmente, debemos establecer el alcance que debe reconocérsele a la disposición constitucional bajo análisis. Para ello debemos analizar los propósitos de la disposición. Como hemos visto, el que se muestra con mayor imponencia es ofrecerle a los partidos de minoría durante el cuatrienio la capacidad necesaria para ejercer su misión fiscalizadora en relación con la gestión legislativa, cuya

---

([22]) Cabe señalar que esta disposición no aplica a casos como el de autos en el cual no ha habido muerte, expulsión o renuncia de un legislador.

duración se extiende durante la totalidad del cuatrienio.([23])
Al disponer de esta forma, el Constituyente proveyó una
garantía para que la voz de los distintos núcleos de opinión
tuviera una efectiva repercusión en la Asamblea Legisla-
tiva, a través de los partidos políticos.

Este interés ha caracterizado nuestra historia política
contemporánea. El tema de la representación de grupos
políticos minoritarios a la Asamblea Legislativa ha estado
presente en nuestro marco político desde principios de
siglo.([24]) Siempre se ha reconocido que "[l]a premisa básica
de nuestro ordenamiento es que la mayoría gobierna me-
diante sus representantes debidamente electos en la Rama
Legislativa". *Silva v. Hernández Agosto*, supra, pág. 69. No
obstante esta premisa insoslayable, durante el presente si-
glo se ha reconocido que la garantía de una representación
efectiva de las minorías en la Asamblea Legislativa con-
forma un elemento necesario adicional de ese principio bá-
sico de gobierno democrático. Véase *Silva v. Hernández
Agosto,* supra, y las autoridades allí citadas.

De ahí que se le haya reconocido al principio de repre-
sentación minoritaria un alcance que trasciende el evento
electoral en sí. Sobre el particular hemos expresado en el
pasado que "[a]unque el desarrollo jurisprudencial sobre
este tema se limita al momento de escoger los candidatos y
a evitar que el derecho al sufragio no sea diluido de tal
forma que el voto de los ciudadanos se torne inefectivo,
nuestro esquema constitucional en su protección a las mi-

---

([23]) "... [E]ntendemos que la misión fiscalizadora de las minorías no puede cum-
plirse eficazmente si no hay la garantía de cierto mínimum de representación en
proporción a los votos que las minorías obtengan, consideradas en conjunto." 4 Diario
de Sesiones, *supra*, pág. 2596.

([24]) Ya en 1914 existía una llamada "Ley de Minorías" para asegurar la repre-
sentación de los grupos minoritarios en la cámara baja del cuerpo. Posteriormente,
se incorporó una fórmula similar en la Ley de 3 de julio de 1951 que dispuso sobre la
elección de los delegados a la Convención Constituyente. Finalmente, la protección
se incorporó a la propia Constitución en la citada Sección 7 que venimos discutiendo.
Véase la discusión del delegado señor Figueroa Carreras, 2 Diario de Sesiones, *su-
pra*, pág. 1308.

norías se extiende más allá del proceso eleccionario. Abarca también la composición de la Asamblea Legislativa para facilitar que represente a todos los sectores de la sociedad". (Citas omitidas.) *Silva v. Hernández Agosto*, supra, pág. 70. Consecuentemente, el balance ideológico que se establece al principio de cada cuatrienio por virtud de la garantía de representación contenida en la Constitución debe prevalecer, dentro de lo posible,[25] durante todo el cuatrienio. Esto no significa que el partido político de minoría por el cual se añadió un legislador a la Asamblea Legislativa, en virtud de la garantía constitucional sobre representación, pueda reclamar un derecho propietario sobre el escaño que ocupa ese legislador. Esto no es óbice para que, sin embargo, pueda reclamar el derecho a que se observe el orden dispuesto por la Constitución en cuanto a la composición de la Asamblea Legislativa dentro de la base de representación adoptada por el Constituyente. A este último reclamo es al que nos referimos a continuación.

B. Restaría adjudicar la controversia presentada a la luz de los principios de derecho descritos. En su apelación los demandantes apelantes presentan como único planteamiento que: "Erró el Tribunal de Instancia al no restablecer el balance constitucional según provee el (sic) Sección 7 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico." Entendemos que el error fue cometido.

Como hemos visto, en las elecciones generales celebradas en Puerto Rico el 3 de noviembre de 1992, el P.N.P. obtuvo más de dos terceras (2/3) partes de los escaños senatoriales; veinte (20) de los veintisiete (27) escaños que originalmente componen el Senado. El P.P.D. y el P.I.P. ob-

---

[25] Dentro de este marco de probabilidades debemos excluir la injerencia, directa o indirecta, con la conciencia individual de cada Legislador. No podemos avalar posiciones que pretendan limitar los dictámenes de la conciencia de los Legisladores, por más radical que éstos puedan parecer. Estas situaciones deben ser sometidas al palio individual de cada legislador y al electorado. Reconocemos que esta fue la intención del Legislador.

tuvieron los restantes siete (7) escaños; seis (6) el P.P.D. y uno (1) el P.I.P. Para el cargo a Gobernador, sin embargo, el P.N.P. obtuvo menos de dos terceras (2/3) partes de los votos emitidos por todos los partidos políticos. Por ello se activó el mandato contenido en la Sección 7.

Consecuentemente, la C.E.E. procedió a analizar los resultados de los comicios para fines de establecer el número y la afiliación política de los candidatos al cargo de Senador que debería certificar electos por adición. El análisis siguió necesariamente lo dispuesto por el Legislador y consignado en el Art. 6.012 de la Ley Electoral de Puerto Rico, *supra*. De conformidad con dicho análisis y para satisfacer el citado mandato constitucional de que los partidos de minoría tuviesen nueve (9) Senadores, dispuso que el P.P.D. tenía derecho a que dos (2) más de sus candidatos fuesen certificados como electos.[26] En atención al orden de votos obtenidos, la C.E.E. procedió a certificar la elección de los Lcdos. Sergio Peña Clos y Eudaldo Báez Galib.

El orden establecido así al principio del cuatrienio se mantuvo hasta el 3 de abril de 1995, cuando el Senador Peña Clos ingresó oficialmente al P.N.P., partido mayoritario. Desde ese momento los partidos de minoría cuentan en el Senado tan sólo con ocho (8) representantes;

---

[26] El cálculo es el siguiente. En relación con el P.P.D., se toman los 862,989 votos emitidos para el cargo de Gobernador por dicho partido y se divide esta cantidad por 942,903, que constituye la cantidad total de votos emitidos para dicho cargo por todos los partidos de minoría. El resultado de esta operación, .92, se multiplica por nueve (9), el número total de Senadores de minoría con que debe contar la composición del Senado. Al resultado de esta operación, 8.28, se le resta el número de Senadores efectivamente electos por el P.P.D., 6. Del total final, 2.24, se elimina toda fracción menor de la mitad de uno. De ahí surge que el P.P.D. tenía derecho a que se certificaran por adición a dos (2) Senadores que corrieron bajo su insignia.

En relación con el P.I.P., el cálculo sigue el mismo desarrollo: 72,219 entre 942,903, que es igual a .08; este número se multiplica por nueve, lo cual arroja un total de .72, a lo que se le resta uno (1), siendo éste el total de candidatos electos para el Senado afiliados al P.I.P. El total final es igual a una fracción menor que la mitad de uno, por lo que resulta que el P.I.P. no tiene derecho a que se le nombre otro candidato al Senado, en virtud de la disposición sobre garantía de representación.

Toda la información relativa a los resultados de los comicios de noviembre de 1992 surgen de la publicación emitida por la C.E.E.: Resultados Finales Escrutinio o Recuentos Isla, Por Precinto y Por Municipio, Elecciones Generales, 3 de noviembre de 1992.

existe en dicho cuerpo un desbalance ideológico, conforme con la fórmula establecida por el Constituyente, que le confiere a los partidos de minoría el derecho a reclamar y ocupar nueve (9) escaños en dicha cámara legislativa. Los principios de representación deben prevalecer durante la totalidad del cuatrienio. Debe restablecerse el referido balance concediéndole a los partidos de minoría el número de representantes que dispuso la Constitución para los casos como el presente, nueve (9).

Restaría tan sólo determinar el remedio que entendemos debe concederse para alcanzar el fin propuesto. A estos fines, los demandantes en instancia sostuvieron que procedía que al Senador Peña Clos se le impidiera fungir como Senador y que los demás oficiales del Senado dejaran de reconocerle las prerrogativas atribuidas ordinariamente a personas que ostentan dicho cargo. El tribunal sentenciador descartó dicha pretensión amparándose en su razonamiento de que lo solicitado significaría la expulsión mediante fíat judicial de un Senador debidamente juramentado. Reconocemos los méritos de dicho razonamiento. No obstante, éste no impide la adjudicación final de la controversia con la correspondiente concesión del remedio que proceda.(27)

Primeramente, ya este Tribunal ha expresado que en materia de interpretación y aplicación de las disposiciones de la Constitución, "[e]xcepto que el lenguaje lo haga inevitable, no debe presumirse que una cláusula de la Constitución no tiene sentido alguno o que destruye el propósito de otra cláusula del mismo documento". *Fuster v. Busó*, supra, pág. 339. Por lo tanto, el que la Sec. 9 del Art. III de la Constitución, *supra*, le confiera al Senado la facultad exclusiva de expulsar a uno de sus miembros, no puede tener el efecto de diluir el propósito que persigue la Sección 7 del

---

(27) Resulta importante tener presente que aunque el nuestro es un sistema adversativo de derecho rogado, un tribunal no tiene que conceder lo que se le pide, su deber es conceder sólo lo que en derecho proceda.

mismo articulado constitucional. Debemos concederle virtualidad a ambas disposiciones, por lo que si bien debemos reconocer que no está disponible el remedio de expulsión que solicitan los demandantes, tenemos que asegurar la preservación de las garantías que concede la Constitución sobre la representación minoritaria a la Asamblea Legislativa.

La propia fórmula dispuesta por el Constituyente en la adopción de la Sección 7 nos provee el esquema que consideramos debe seguirse en este caso. Esta ordena que se aumente el número de los miembros del Senado cuando el partido de mayoría obtiene, mediante elección, más de dos terceras (2/3) partes de los veintisiete (27) escaños de los que originalmente está compuesto dicho cuerpo. La cantidad por la cual se aumentará la composición del Senado será aquella que sea necesaria para concederle a los partidos de minoría los nueve (9) escaños que la Constitución le garantiza. En cuanto a la afiliación de los candidatos que deben ser considerados por la C.E.E. para efectuar la correspondiente asignación al cargo de Senador, éste organismo debe adherirse a la misma fórmula dispuesta en el citado Art. 6.012 de la Ley Electoral de Puerto Rico.

Ya hemos visto que de conformidad con dicha fórmula procede la certificación de la elección de un Senador adicional afiliado al P.P.D. Le corresponde a la C.E.E.[28] efectuar el análisis correspondiente, en atención a los votos obtenidos en las elecciones de 3 de noviembre de 1992, primeramente en relación con los candidatos a Senadores por Acumulación por el P.P.D. que no resultaron electos y, sólo cuando no exista otra alternativa, deberá proceder a considerar los candidatos a Senador por Distrito de dicho

---

[28] No procede, por ser contraria al derecho descrito, la pretensión presentada por los demandantes en instancia en el sentido de que se les permitiera escoger entre sus filas a la persona que ocuparía el cargo adicional al que tenían derecho. En estos casos la Constitución no provee esa facultad. La determinación la deberá tomar la C.E.E. con exclusiva sujeción a los parámetros establecidos en el Art. 6.012 de la Ley Electoral de Puerto Rico, *supra.*

partido. Para ello deberá observar, además de lo expresamente consignado en el presente párrafo, toda otra disposición aplicable del referido Art. 6.012 de la Ley Electoral de Puerto Rico.

En atención con los fundamentos descritos, procederíamos a dictar sentencia que revoque la sentencia apelada y ordene a la C.E.E. que, dentro de un término razonable que no debería exceder de diez (10) días[29] y en atención a los parámetros dispuestos en el citado Art. 6.012 de la Ley Electoral de Puerto Rico, proceda a certificar electo al próximo candidato hábil de acuerdo con la ley para que ocupe un escaño que se adicionará a los veintinueve (29) ya existentes en el Senado de Puerto Rico.

— O —

Opinión concurrente en parte y disidente en parte emitida por el Juez Asociado Señor Fuster Berlingeri.

En relación con el derecho patrio, la controversia del caso de autos tiene gran importancia. Nos toca decidir si una de las disposiciones verdaderamente autóctonas de nuestra propia Constitución, relativa al orden político del país, tiene eficacia duradera o si, en cambio, sólo es una medida anodina que está sujeta a la merced del trapicheo partidista. En efecto, nos toca resolver si las minorías políticas en Puerto Rico tienen un sólido derecho propio a la representación legislativa o si en 1952 lo que quiméricamente se les otorgó fue un derecho tenue, que depende en realidad de las conveniencias y los vaivenes de los designados a ostentar esa representación.

---

[29] En la Ley Electoral de Puerto Rico se reconoce la necesidad de imprimir celeridad y certeza a los procedimientos eleccionarios, por lo que de ordinario los términos dispuestos en la misma son relativamente cortos y de carácter perentorio. Por ejemplo, véanse los términos dispuestos para procedimientos posteriores a la votación contenidos en los Arts. 6.010 y 6.014 de esta ley, 16 L.P.R.A. secs. 3270 y 3274, respectivamente. En consideración a este mismo principio, adoptamos el citado término de diez (10) días.

# I

Para dilucidar a cabalidad la cuestión ante nos, es menester examinar brevemente el origen y los propósitos de la disposición constitucional sobre la representación legislativa de las minorías y su relación con la representación legislativa ordinaria establecida en nuestra Ley Fundamental. Estos asuntos están claramente expuestos y discutidos en *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Río Piedras, Ed. U.P.R., 1954, págs. 254–266, que es parte integral del historial de la Constitución, y en la primordial *Historia Constitucional de Puerto Rico* de José Trías Monge, miembro de la Convención Constituyente. Veamos.

Los miembros de la Convención Constituyente de Puerto Rico conocían que en la teoría democrática, que es base del Estado moderno, se considera al Legislador electo como representante de todo el pueblo, no como representante sólo de quienes lo eligieron. En nuestros días, la condición del Legislador electo no es como era la de la representación parlamentaria de los antiguos estamentos medievales, conforme a la cual el Legislador se debía sólo a las ideas y a los intereses de sus particulares comitentes.

La adhesión a esta visión moderna de la representación legislativa fue una de las razones por las cuales quienes redactaron nuestra Constitución *rechazaron* el principio de la representación proporcional como *el método principal* para integrar la Asamblea Legislativa de Puerto Rico. Como bien se señaló en *La Nueva Constitución de Puerto Rico, op. cit.*, págs. 259–260:

> El primer argumento en contra de la representación proporcional consiste en que falsea los principios de la representación política que son base del Estado moderno. ... El representante moderno ... no está obligado por instrucciones estrictas, pues no representa solamente a la mayoría que lo eligió, ni al distrito por el cual fue elegido, sino que representa a la totalidad del pueblo, y sólo responde ante su conciencia. Con el sistema

de representación proporcional este sano principio se vicia, al dar entrada oficial a los partidos y grupos políticos ... convirtiendo a [los legisladores], de un modo demasiado decidido y casi forzoso, de representantes del pueblo en funcionarios del partido a que deben su elección y al que por ello quedan excesivamente subordinados.

No obstante lo anterior, los miembros de la Constituyente no rechazaron por completo el principio de representación proporcional. Es decir, acogieron principalmente la aludida visión moderna de la representación legislativa, pero también acogieron, de manera limitada y excepcional, la representación legislativa atada a los comitentes. Ello, porque les *preocupaba también, hondamente, el problema de la representación minoritaria.* Sabían que en el pasado las minorías políticas en Puerto Rico no habían logrado una representación adecuada en la Legislatura.([1]) Conocían íntimamente los peligros a la democracia que representa el total control legislativo por parte de un gran partido mayoritario. Entendían que el proceso político-democrático se enriquece con la crítica y la fiscalización que los representantes de las minorías pueden hacer con respecto a la labor de una mayoría fuerte. Por ello, decidieron fortificar la posición de las minorías en el nuevo régimen legislativo que habría de crearse con la adopción de la Constitución. *Establecieron la representación proporcional en forma excepcional y limitada,* modificadamente, para asegurarle a las minorías una representación legislativa mínima irreducible; para impedir que una mayoría fuerte llegase a ser abrumadora; para que la labor de vigilar a la mayoría pudiese realizarse de forma adecuada; para garantizar que la voz en la Legislatura de las corrientes de opinión pública minoritaria tuviese algún volumen. Las ci-

---

([1]) Así, pues, en 1948 el Partido Popular Democrático había obtenido el 62% de los votos en las elecciones generales, pero lograron todos los escaños de la Cámara de Representantes menos uno.

tas siguientes de *La Nueva Constitución de Puerto Rico,*
*op. cit.,* págs. 264–265, son particularmente pertinentes:

> Sin embargo, no faltan argumentos en favor de fortificar la
> posición de la minoría dentro del sistema puertorriqueño. La
> misma presencia de un gran partido mayoritario envuelve el
> peligro de la identificación del número con el buen criterio.
> Ahora bien: no es indispensable en absoluto optar entre dos
> soluciones extremas; hay otros medios para asegurarle a la mi-
> noría una representación mayor de la que actualmente puede
> obtener. Ello se conseguiría, sin poner en peligro la estabilidad
> y capacidad ejecutiva del gobierno, bien sea estableciendo la
> representación proporcional en forma limitada y en combina-
> ción con el sistema territorial que hoy existe, bien sea arbi-
> trando otros mecanismos electorales que, dentro del sistema
> existente, cambien los procedimientos electorales.
>
> . . . . . . . .
>
> Estos arreglos de proporcionalidad y atribución previa de un
> mínimum para las minorías pueden establecerse, tanto en el
> supuesto de adoptarse el sistema unicameral, como si se man-
> tienen las dos cámaras, ya que serían aplicables a ambas. Pero,
> sea como quiera, debemos insistir en la necesidad de aumentar
> el número de legisladores elegidos por acumulación, pues un
> número demasiado escaso de ellos privaría de verdadera efec-
> tividad al sistema de representación proporcional limitada que
> aquí se propone.

El examen del historial de la Constitución no deja espa-
cio para duda alguna con respecto a que en la Convención
Constituyente existía una voluntad decidida y unánime de
*garantizar* que las minorías *tuviesen siempre* una repre-
sentación adecuada en la Legislatura. Las diferencias so-
bre el particular que se debatieron allí tuvieron que ver
con la cuestión de cómo garantizar dicha representación
legislativa minoritaria. Así, pues, los delegados republica-
nos, Ferré y García Méndez, favorecían "el sistema de re-
servarles en todo caso a los partidos minoritarios una ter-
cera parte de los escaños en la Asamblea Legislativa".
(Escolio omitido.) Trías Monge, *op. cit.,* pág. 146.
El método seleccionado finalmente para asegurar la re-
presentación minoritaria fue el de adicionar determinados
escaños legislativos *que pertenecerían a las minorías polí-*

*ticas* en casos cuando un partido de mayoría obtuviese más de dos terceras partes de los miembros de una cámara. Estos escaños, contrario a los de elección ordinaria, estarían ocupados por personas que no representarían al pueblo como tal, sino a las minorías correspondientes. El propósito deliberado del mecanismo de la representación de minorías fue precisamente que estos particulares representantes fuesen diferentes a los demás y, en lugar de deberse al pueblo en general, estuviesen obligados a los partidos o grupos políticos minoritarios que los nominaron. El pequeño número de personas que llegarían a ser miembros de la Asamblea Legislativa, no por haber ganado su escaño electivo en los comicios generales, sino por mor de la disposición de representación de minorías, constituirían, pues, un grupo *especial*: no serían representantes de la totalidad del pueblo, sino sólo de la minoría a la cual debían su designación.

Lo anterior fue el innegable esquema adoptado en la Constituyente. Véanse: *La Nueva Constitución de Puerto Rico, op. cit.*, págs. 264–266, y Trías Monge, *op. cit.* En el propio Informe de la Comisión de la Rama Legislativa de la Convención Constituyente se señaló que:

> La Comisión de la Rama Legislativa entiende que la mejor y más democrática forma de elegir una asamblea legislativa es reconociendo el principio de representación a las distintas áreas geográficas [y] que este principio se complementa creando un número razonablemente alto de escaños para ser cubiertos por acumulación .... Sin embargo, es posible que una inadecuada distribución de los votos obtenidos por las minorías produzca el resultado indeseable de que su representación en las cámaras no guarde proporción con los votos que obtengan en las urnas. Previendo esta situación, la Comisión ha elaborado un plan de representación que garantiza una justa representación a los grupos minoritarios que no la obtengan en razón a los factores señalados. 4 Diario de Sesiones de la Convención Constituyente 2595–2596 (1951).

De todo lo ya señalado es evidente que, conforme al esquema constitucional, de ocurrir que un partido mayorita-

rio obtuviese en los comicios generales más de dos terceras partes de los miembros ordinarios de una cámara, se añadirían a las cámaras unos escaños especiales que habrían de adjudicarse a los partidos de minoría. Estos escaños especiales serían ocupados por candidatos de la minoría que concurrieron en los comicios, pero que no lograron ser electos en ellos. Los legisladores aludidos, pues, serían unos representantes de condiciones muy diferentes a los legisladores corrientes: (1) su escaño no sería regular; (2) no sería un candidato ganador, y (3) su mandato constitucional no sería de representar al pueblo en general sino de representar precisamente a un sector minoritario del pueblo.

La referida condición especial de los legisladores de minoría planteaba evidentemente el problema de si éstos tendrían un rango y una ubicación en la cámara similar al de los legisladores ordinarios. ¿Cuáles serían sus derechos y deberes? ¿Debía reconocérsele la misma jerarquía que a los demás, a pesar de ser representantes más bien designados que electos? ¿Tendrían estos representantes de minoría una condición legislativa inferior a la de los otros miembros de las cámaras, por no haber resultado electos a los cargos a que aspiraron originalmente? Esta delicada cuestión tenía que ser atendida expresamente, ya que en la Convención Constituyente había surgido la posibilidad de que a estos legisladores de minoría se les considerase como representantes de menor condición que los demás. Al referirse a ellos se había hablado allí de "dádivas" y de "generosidad" para con las minorías, criterios evidentemente paternalistas y desdeñosos que era menester conjurar. 2 Diario de Sesiones de la Convención Constituyente 1303–1307 (1951).

Para resolver esta cuestión se dispuso expresamente que los representantes de minorías en cuestión serían considerados como legisladores por acumulación. Tendrían derecho, pues, a ser tratados por sus respectivas cámaras como si fueran representantes ordinarios, con el mismo

rango que los demás legisladores y con iguales emolumentos, obligaciones y prerrogativas, a pesar de que constituían una categoría excepcional de representación. Se quiso asegurar así que los representantes de minoría no tendrían un rango legislativo inferior al de los otros miembros de la Legislatura, sin que importase el hecho de que sus escaños no habían sido conquistados en las urnas, sino concedidos por la Constitución.

El referido trato igual, como si fueran legisladores por acumulación, dispuesto por la Constitución no significa, claro está, que una vez juran sus cargos, los representantes de minoría *dejan de serlo* y se convierten completamente en legisladores ordinarios, como los legisladores por acumulación que ganaron sus escaños en los comicios generales. No tiene sentido jurídico alguno atribuirle tal alcance a la disposición constitucional que persigue asegurar que se le dé un relativo trato igual a los representantes de minoría. No sólo no hay nada en el historial de la Constitución que avale una interpretación tan insólita, sino que ello equivaldría a imputarle un absurdo a quienes redactaron nuestra Ley Fundamental. Pretender que el Legislador, que se añade al cuerpo legislativo precisamente con el sólo propósito de darle una voz más efectiva y justa a una de las minorías políticas del país, puede darle la espalda a tal minoría e incluso combatir sus puntos de vista esenciales, tan pronto jura el cargo que le fue asignado, equivale a suponer que los miembros de la Constituyente incurrieron en la contradicción absurda de *suprimir* en el penúltimo párrafo de la disposición constitucional sobre representación de minorías exactamente lo que buscaban establecer al aprobar dicha disposición. Llevada a su extremo lógico, tal interpretación significa que la persona que ha sido certificada como miembro de una cámara legislativa para representar a una minoría no está obligada a hacerlo, y puede ignorar su encomienda desde el momento mismo en que se convierte en miembro de tal cámara. Así el "repre-

sentante de minorías" nunca llega a representar la minoría. La honda y genuina preocupación de quienes redactaron nuestra Constitución por asegurarle siempre una representación legislativa efectiva a las minorías, que es patente en los debates que ocurrieron en la Constituyente sobre el particular, le niegan todo viso de posibilidad a una interpretación tan enmarañada de la disposición sobre darle trato como legislador por acumulación a los representantes de minoría.

## II

Este Tribunal, en varias ocasiones, se ha expresado en torno al significado y al alcance del autóctono precepto constitucional en cuestión. *Tres conceptos fundamentales prevalecen en nuestros pronunciamientos previos.* Primero, que la disposición constitucional sobre la representación de las minorías es un "mecanismo innovador" que constituye "un gran adelanto en nuestro proceso electoral", y que es un fin o medio "básico para la salud democrática de nuestro país". *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *Noriega v. Hernández Colón*, 126 D.P.R. 42 (1990); *Hernández Torres v. Gobernador*, 129 D.P.R. 678 (1991).

El segundo concepto normativo que hemos reconocido invariablemente es que el propósito del mecanismo constitucional en cuestión es *garantizar* que las minorías tendrán siempre una *representación efectiva* en la Asamblea Legislativa. *Fuster v. Busó*, 102 D.P.R. 327 (1974); *Noriega v. Hernández Colón*, supra; *Hernández Torres v. Gobernador*, supra. No vale una representación menguada: ésta tiene que ser eficaz y adecuada siempre.

Finalmente, hemos hecho hincapié en que la representación de minorías aludida está atada y se conduce *a través de los partidos políticos minoritarios*. *García Passalacqua*

*v. Tribunal Electoral*, 105 D.P.R. 49, 55 (1976); *Fuster v. Busó*, supra; *P.I.P. v. Comisión Electoral*, supra.

Es menester aclarar que nuestros pronunciamientos en casos anteriores, a los efectos de que la representación especial de las minorías, que ordena la Constitución, está vinculada a los *partidos* de minoría y surge del propio *texto* de la Constitución. La Sec. 7 del Art. III de nuestra Ley Fundamental, que es la que contiene la garantía en cuestión, no sólo se titula "Representación de *partidos* de la minoría", sino que toda su redacción literal gira esencialmente en torno a los *"partidos* de minoría". (Énfasis suplido.) L.P.R.A., Tomo 1, ed. 1982, pág. 336.

En particular, la aludida Sec. 7 del Art. III de la Constitución dispone en su último párrafo que la Asamblea Legislativa adoptará las medidas necesarias para reglamentar la garantía de representación de minorías, y que fijará

> ... el número mínimo de votos que deberá depositar un *partido de minoría* a favor de su candidato a Gobernador *para tener derecho a la representación* que en la presente se provee. (Énfasis suplido.) Const. E.L.A., *supra*, pág. 338.

No cabe, pues, la menor duda de que el aludido mecanismo especial de representación de minorías se hace efectivo a través de los *partidos* políticos que tengan esa condición. Por ello fue que en *Fuster v. Busó*, supra, le negamos un asiento legislativo de minoría al candidato Roberto Sánchez Vilella, quien había obtenido casi 60,000 votos para el cargo de Representante por Acumulación en las elecciones de 1972, mientras estuvimos de acuerdo con que uno de los tres escaños de minoría que se añadieron a la Cámara de Representantes, luego de esos comicios, lo ocupara un candidato del Partido Independentista Puertorriqueño que había obtenido sólo 127 votos. Como resultado de los referidos comicios, uno de los tres escaños añadidos en virtud del mandato constitucional sobre la representación de las minorías había sido otorgado al Partido Nuevo Progresista y otro al Partido Independentista Puertorri-

queño. Se cuestionó ante nos si el tercer escaño debía concedérsele también al Partido Independentista Puertorriqueño, aunque esa colectividad ya había obtenido uno de esos escaños, mientras que el tercer sector de opinión pública minoritario, que representaba Sánchez Vilella, no tenía representación alguna. La cuestión se amparaba también en un planteamiento sobre la igualdad del voto (*one man, one vote*), ya que el segundo candidato del Partido Independentista Puertorriqueño que iba a ser añadido a la Cámara Legislativa sólo había obtenido una cantidad infinitesimal de votos, comparados con los recibidos por Sánchez Vilella. En dicho caso rechazamos los planteamientos aludidos y estuvimos de acuerdo con que el Partido Independentista Puertorriqueño tenía derecho al escaño en cuestión, logrando así dos escaños de minoría, a pesar de las circunstancias aludidas. Ello porque el Partido Independentista Puertorriqueño como tal había obtenido más votos que el de Sánchez Vilella. Lo determinante, pues, fue la representación del *partido* de minoría.

Nada de lo anterior conflige con lo indicado en el Informe de la Convención Constituyente, en el cual se señaló, para aclarar su *propósito*, que la aludida garantía de minorías se establecía "como medio de dar justa interpretación a la voluntad del pueblo y no como una concesión a partidos políticos". 4 Diario de Sesiones, *supra*, pág. 2596. En efecto, la garantía no se estableció para beneficiar a los partidos como tal, en el sentido estricto de la palabra, sino para hacer valer los derechos de sus electores. Es una garantía para los *votantes* que se agrupan en tales partidos, no para la estructura que los organiza. Pero al momento de implantar la garantía, el *medio* que se utiliza para alcanzar su *propósito* gira en torno al partido que agrupa a los electores de minoría. Dicha garantía se pone en vigor con arreglo a los votos correspondientes de los *partidos* en cuestión, y se otorga la representación a candidatos a elección de tales *partidos*.

### III

A la luz de lo expuesto en los Acápites I y II de esta opinión, jurídicamente es claro que, en el caso de autos, el escaño legislativo que había ocupado Sergio Peña Clos, sólo existe para darle una voz efectiva en el Senado a la minoría política que constituye el Partido Popular Democrático. Dicho escaño sólo puede ser ocupado por una persona que en efecto represente a esa minoría. Como consecuencia del cambio de lealtades políticas de Peña Clos, la minoría popular ha sido privada de una parte importante de la representación efectiva que la Constitución le garantiza.

No cabe duda de que Peña Clos tiene derecho como persona a cambiar su afiliación política. A lo que no tiene derecho es a pretender ocupar un escaño legislativo que se le concedió únicamente para representar la minoría popular.

Como el Partido Popular Democrático ha reclamado a nombre de sus electores el escaño que a ellos pertenece, procede jurídicamente que éste sea ocupado ahora por una persona que represente propiamente a la minoría en cuestión.

Resolver de otro modo sería equivalente a anular la histórica disposición constitucional de la representación de las minorías. Significaría que el importante rol legislativo consagrado a las minorías en el esquema constitucional puede ser desbaratado por el vaivén y el trapicheo político, cosa que no tiene justificación o fundamento alguno en el texto constitucional, en su historial ni en nuestros propios precedentes.

Aunque en otro contexto, recientemente hemos reconocido la particular injerencia de los representantes de las minorías en el proceso legislativo, y resaltamos el rango constitucional que tiene su función de fiscalizar. *Silva v. Hernández Agosto*, supra. Esa función adquiere especial importancia en aquellos asuntos cruciales que sólo pueden

conducirse si están apoyados por más votos que los de mayoría ordinaria, como sucede cuando se intenta superar un veto del Ejecutivo; iniciar procesos de residenciamiento; pronunciar fallo condenatorio en un juicio de residencia; expulsar miembros de alguna cámara, y proponer enmiendas a la Constitución. Se trata de asuntos respecto a los cuales la mayoría legislativa casi siempre necesita el voto de la minoría. El desempeño cabal de esta ingente función de las minorías quedaría en *grave riesgo* si quienes ostentan su representación, precisamente por mandato constitucional, pueden dejar de ser minoría y aun así conservar sus escaños especiales.

## IV

Para proteger en el caso de autos el derecho de la minoría popular a la representación legislativa, que la Constitución le garantiza, no es necesaria la *expulsión* de Peña Clos, como erróneamente señaló el foro de instancia en su sentencia. El poder de expulsión es la facultad más extrema que tienen las cámaras legislativas como parte de su autoridad para imponer medidas disciplinarias y castigar a sus miembros por haber incurrido en una conducta ilícita. Se trata de un poder que las legislaturas usan en muy pocas ocasiones. Véase *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 379. Y sólo puede ejercitarse dicho poder por las causas expresamente señaladas en la Constitución. *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). La desafiliación de Peña Clos como miembro del Partido Popular Democrático obviamente no es una de esas causas, por lo que no cabe de modo alguno aplicar a este caso el concepto normativo de *expulsión*.

Desde el punto de vista jurídico, ¿cómo, entonces, debe atenderse lo relativo a la posición de Peña Clos en el Senado, una vez se ha establecido que no puede continuar en

el escaño que antes ocupaba porque éste pertenece a la minoría popular? Si no procede su *expulsión*, ¿qué procede?

Para responder a esta interrogante debe recordarse, inicialmente, que en la doctrina constitucional es antigua ya la distinción entre la *exclusión* y la *expulsión* de un legislador. *Santa Aponte v. Srio. del Senado*, supra, págs. 762–763. La *exclusión* de un legislador ocurre cuando la cámara correspondiente enjuicia la validez de la elección de un candidato, determina que no cumple con los requisitos legales necesarios para ser miembro de dicha cámara y, por lo tanto, le impide ocupar su escaño. Tal exclusión ocurre de ordinario al inicio de la sesión legislativa. *Powell v. McCormack*, 395 U.S. 486 (1969). La *expulsión*, en cambio, es una medida *disciplinaria*, que presupone que el Legislador ha cometido un acto ilícito y que requiere la concurrencia de una mayoría especial para poder llevarse a cabo. Apareja un estigma y otras consecuencias e implicaciones que la exclusión no conlleva. *Powell v. McCormack*, supra.

En *Santa Aponte v. Srio. del Senado*, supra, reconocimos expresamente que existen situaciones en las cuales una cámara debe actuar con respecto a la falta de capacidad de un legislador para servir como tal y que no era "razonable resolver que en tales situaciones el Poder Legislativo tiene a su alcance tan solo el procedimiento de expulsión". Íd., pág. 764. En efecto, constituiría una camisa de fuerza irrazonable el que, frente a determinadas situaciones irregulares en las cuales no cabe la expulsión, ya que no constituyen delitos, la cámara legislativa esté impedida de tomar la acción correctiva necesaria. Tal sería el caso, por ejemplo, cuando un legislador que, luego de ser miembro de una cámara por mucho tiempo, sufre una enfermedad y pierde sus facultades mentales, pero continúa en dicha cámara. O el de un legislador que, luego de servir como miembro de una cámara por varios años, se ausenta indefinidamente de Puerto Rico y no participa en las tareas legislativas por largos períodos, sin permiso de dicha

cámara, y sin renunciar a su escaño. ¿Está impedida la cámara de actuar en estos dos casos sólo porque constitucionalmente los legisladores aludidos no pueden ser expulsados? La situación de autos es análoga a las dos ya referidas. No cabe una expulsión, por ausencia de una conducta delictuosa, pero, conforme a nuestro pronunciamiento en *Santa Aponte v. Srio. del Senado*, antes citado, sería irrazonable resolver que no existe remedio válido alguno para encarar ésta.

La solución para las situaciones referidas está implícita en la Sec. 8 del Art. III de la Constitución, L.P.R.A., Tomo 1. Esa sección contempla que surjan *vacantes* en las cámaras legislativas, y en ella se dispone cómo se cubrirá dicha vacante, de surgir alguna. La sección aludida no indica expresamente cuándo es que ocurre una vacante, pero es evidente que ello sucede *de ordinario* con la muerte o renuncia de un legislador. *Jurídicamente, y a modo de excepción, ello puede suceder también en otras situaciones.* Durante los tiempos de la Cámara de Delegados de Puerto Rico bajo el régimen de la Carta Orgánica Foraker, el Código Político disponía que si algún miembro de dicha cámara se ausentaba de sus tareas por más de cinco días consecutivos, sin permiso de la Cámara, su cargo se consideraba vacante. A la luz de este precedente, cuya razonabilidad es evidente, y conforme a nuestro aludido pronunciamiento en *Santa Aponte v. Srio. del Senado, cabe aplicar a las situaciones referidas anteriormente la figura jurídica de considerar vacante el escaño legislativo. Es decir, cabe resolver aquí que cuando los requisitos legales que un legislador ya había satisfecho para ocupar su escaño cesan por circunstancias que sobrevinieron posteriormente, dicho escaño se considerará vacante.*

En resumen, pues, lo que ha ocurrido aquí, en el caso de autos, es que al integrarse Peña Clos al Partido Nuevo Progresista y al reclamar la minoría popular el escaño que les pertenece, éste ha quedado *vacante*, ipso jure. No se expulsa a Peña Clos. Sólo se declara que como ha perdido

la condición necesaria para ser representante de minoría, el escaño que ocupaba para tales fines ha quedado vacante. Constitucionalmente, pues, procede ahora que se certifique como electo a un senador adicional del Partido Popular Democrático para ocupar el escaño en cuestión.

Debe quedar claro que el escaño que le corresponde a la minoría popular es precisamente el que venía ocupando Peña Clos hasta ahora. No puede ser un escaño adicional nuevo, que deba crearse por razón de nuestra decisión en este caso. El número de escaños y la composición de la Asamblea Legislativa están fijados taxativamente en la Constitución del Estado Libre Asociado de Puerto Rico. Ni este Tribunal ni la propia Asamblea Legislativa tienen autoridad para variar por fíat el número de escaños legislativos. Para ello se requiere una *enmienda* a la Constitución. Cualquier decisión nuestra, o de la Legislatura, de añadir otro escaño más al Senado para proteger el derecho a la representación de la minoría popular constituiría un ominoso y grave abuso de autoridad.

En cambio, que este Tribunal declare que el escaño ocupado hasta ahora por Peña Clos pertenece a la minoría popular y que ha quedado vacante ipso jure al esa minoría reclamarlo, no presenta problema jurídico alguno. Se trata de una *interpretación* de la Constitución, no de una enmienda a ésta. Como hemos señalado reiteradamente, la función de ser intérprete final de la Constitución del Estado Libre Asociado de Puerto Rico le corresponde en exclusiva a este Tribunal. Esa función incluye la de definir concretamente los contornos del Poder Legislativo, siguiendo lo que está delineado en nuestra Ley Fundamental.

Para terminar, y haciendo eco de las expresiones pertinentes del Tribunal Supremo de Estados Unidos en *Powell v. McCormack*, supra, es menester señalar que este Tribunal no puede suponer que el ejercicio de su función exclusiva de declarar cuál es el significado de la Constitución

pueda dar lugar a una confrontación potencialmente embarazosa con la Rama Legislativa, como algunos parecen pensar. Sería impropio e infundado conjeturar que esa rama no honraría el orden constitucional del país, según declarado judicialmente. Y así como no podemos presumir que habrá conflicto con otra rama de gobierno, mucho menos podemos evadir nuestra responsabilidad constitucional de declarar cuál es ese orden, por el supuesto conflicto que pueda causar la adjudicación que legítimamente nos corresponde hacer. Evadir nuestro deber por tal razón conllevaría la destrucción del régimen de Derecho en Puerto Rico. Tal régimen existe cuando todos en la colectividad, incluyendo las ramas políticas, están sometidos al ordenamiento jurídico. Ese régimen no puede subsistir si las decisiones judiciales que son procedentes conforme a ese ordenamiento se suprimen, y no se emiten, por temor al poder de las ramas políticas del Estado. Entonces no impera el Derecho; impera el poder.

## V

He decidido emitir un voto concurrente a favor de lo que se resuelve en los Acápites I, II y parte del IV de la Sentencia del Tribunal, a pesar de que lo dispuesto en ellos no refleja completamente mi posición sobre el particular. Por los fundamentos expuestos antes, sostengo que en el caso de autos procede que se certifique como miembro adicional del Senado a un candidato del Partido Popular Democrático para completar la representación legislativa a que dicha colectividad tiene derecho, y así ocupar el escaño vacante que antes tenía Peña Clos. Es evidente que no es precisamente esto lo que el Tribunal resuelve en los acápites referidos.

Más aún, el aludido dictamen del Tribunal es problemático por otra razón. En la madeja resultante de posturas coincidentes en unos asuntos y dispares en otros, hay una

mayoría de miembros de este Tribunal que, por razones opuestas, no creen que deba añadirse un *escaño* adicional a los ya existentes en el Senado. Se trata de una mayoría de este Tribunal distinta de la que coincide en que la minoría en el Senado tiene derecho a un *miembro* adicional en ese cuerpo, y distinta asimismo de otra tercera mayoría que, también por razones opuestas, coincide en que Peña Clos puede permanecer en el Senado.

No obstante lo anterior, he decidido emitir el referido voto concurrente, a la vez que disiento vehementemente de lo que dimana del Acápite III y parte del IV de la Sentencia, a fin de lograr algún resultado idóneo, que no deje el caso de autos en el limbo jurídico de confirmar por empate el errado dictamen de instancia. Es decir, frente a un resultado malo, y otro peor, he optado por el que protege en algo el valor constitucional más importante, que es el derecho a representación de las minorías.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Corrada Del Río, a la cual se une el Juez Asociado Señor Rebollo López.

En el caso de autos se plantean importantes cuestiones en torno a las disposiciones de la Sec. 7 del Art. III de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.

Por los fundamentos que esbozaremos más adelante, disentimos del resultado al que llega el Tribunal en este caso al hacer aplicable las disposiciones de la Sec. 7, *supra*, y del Art. 6.012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3272, más allá de lo que requiere su alcance y al requerir por fíat judicial que se añada un senador a la plantilla electa, en virtud de los resultados de las Elecciones Generales de 1992. De igual forma concurrimos con el resultado tomado el día de hoy, en lo que respecta a la

permanencia del Senador Sergio Peña Clos en su escaño legislativo.

Los hechos necesarios para adjudicar la controversia planteada ante nos no están en disputa. Como cuestión de hecho, fueron estipulados por las partes ante el foro recurrido.

De lo allí estipulado, y tomando conocimiento judicial de los resultados electorales de los comicios generales de 1992, podemos resumir los hechos más relevantes de la forma siguiente.

Como resultado de las Elecciones Generales de 3 de noviembre de 1992, los candidatos adscritos al Partido Nuevo Progresista (en adelante P.N.P.) que competían para posiciones en el Senado de Puerto Rico obtuvieron veinte (20) escaños; de igual forma, los candidatos adscritos al Partido Popular Democrático (en adelante P.P.D.) obtuvieron seis (6) escaños, y el Partido Independentista Puertorriqueño (en adelante P.I.P.) obtuvo un (1) escaño.

En vista de la certificación que de los anteriores resultados cursara la Comisión Estatal de Elecciones (en adelante C.E.E.), se activó la disposición contenida en el Art. III, Sec. 7 de la Constitución de Puerto Rico, *supra*. En atención a lo anterior, y en virtud de las disposiciones de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 *et seq.*, la C.E.E. procedió a certificar los candidatos adicionales que debían declararse electos en representación de los partidos de minoría. A tales efectos, la C.E.E. certificó como electos a los Senadores Sergio Peña Clos y Eudaldo Báez Galib. Ambos Senadores prestaron sus juramentos y se desempeñan en las funciones correspondientes a su cargo.

El 12 de octubre de 1993 el Senador Peña Clos notificó al Senador Miguel Hernández Agosto, Presidente del P.P.D. y portavoz de dicho partido en el Senado, y al Senador Roberto Rexach Benítez, Presidente del Senado de Puerto Rico, que había decidido abandonar el *caucus* del

P.P.D. para considerarse desde ese momento como un senador independiente.

El 6 de febrero de 1995 el P.P.D., conjuntamente con los siete (7) Senadores afiliados a dicha colectividad, presentaron la demanda que origina el recurso ante nos. En síntesis, solicitaron del tribunal de instancia que se expulsara al Senador Peña Clos y que se ordenara a la C.E.E. a certificar un escaño adicional conforme lo dispone la Ley Electoral de Puerto Rico y la Constitución. En este aspecto solicitaron que se le permitiese al P.P.D. certificar al candidato que habría de ocupar dicho escaño.

Posteriormente, el 4 de marzo de 1995, el Senador Peña Clos formalizó su desafiliación con el P.P.D., y el 3 de abril de 1995 ingresó oficialmente al P.N.P.

El Tribunal de Primera Instancia declaró sin lugar la demanda.

Oportunamente, los demandantes acudieron ante nos para argumentar que el recurso plantea una cuestión constitucional sustancial. Con el beneficio de la comparecencia de las partes procedemos a considerar las controversias planteadas.

I

En primer término, es menester aclarar que el caso de autos no plantea problemas jurisdiccionales en cuanto a la aplicabilidad de las doctrinas de legitimación activa, academicidad y cuestión política.[1] En atención a que los demandantes recurrentes poseen una legitimación activa para incoar la reclamación ante nos; a que este caso no plantea una cuestión política que requiera nuestra autolimitación judicial, y al no ser académica dicha controversia, podemos resolver la controversia planteada ante nos.

---

[1] Al respecto, véanse: *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995); *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1994); *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994), y *Baker v. Carr*, 369 U.S. 186 (1962).

En síntesis, debemos determinar la consecuencia jurídica de que un legislador que advino a su posición en virtud de la ley de minorías, y posteriormente se desafilia de la colectividad política bajo la cual fue nominado como candidato en las elecciones, se afilia al partido de mayoría. Las alternativas que tenemos ante nos se circunscriben a determinar si dicho legislador puede ser expulsado de su posición tal y como solicitan los demandantes recurrentes; si corresponde añadir un escaño a la colectividad política que nominó al legislador originalmente para cumplir con las disposiciones constitucionales sobre la representación de minorías, o si dicha desafiliación y nueva afiliación no tiene alcance jurídico constitucional.

Entendemos que en el caso de autos aplica esta última alternativa. Veamos.

Los forjadores de nuestra Constitución entendieron que era de vital importancia para la democracia en nuestro pueblo la representación de las minorías, y por tal razón incluyeron en nuestra Carta Magna la Sec. 7 del Art. III, *supra*, ed. 1982, págs. 336–338, que dispone en lo pertinente:

Cuando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura, según ambos términos se definan por ley, se aumentará el número de sus miembros en los siguientes casos:

a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hubiese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Representantes o de ambos cuerpos, según fuere el caso, *declarándose electos* candidatos del partido o partidos de minoría en número suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, *la elección adicional* de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos

con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.

Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la proporción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.

. . . . . . . . .

Para seleccionar los candidatos adicionales de un partido de minoría, en cumplimiento de estas disposiciones, se considerarán, en primer término, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término sus candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos.

Los Senadores y Representantes adicionales *cuya elección se declare* bajo esta sección serán considerados *para todos los fines* como Senadores o Representantes por Acumulación.

La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimos de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee. (Énfasis suplido.)

No surge de las discusiones de la Asamblea Constituyente que la intención al incorporarse esta disposición constitucional fuese pretender que se congelara o plasmara el resultado electoral más allá del momento cuando se declaran electos los legisladores, conforme al escrutinio y a la certificación de la Comisión Estatal de Elecciones. Es en virtud de dichos resultados electorales y su certificación que se constituyen los cuerpos legislativos. Tampoco surge de la discusión en la Asamblea Constituyente que cualquier cambio por desafiliación y nueva afiliación de un legislador, con posterioridad a la determinación de la plantilla legislativa a la luz de los resultados en los comicios,

tendría el efecto de requerir ajustes subsiguientes en esa plantilla.

## II

Los cambios de afiliación política no son nada nuevo en nuestro quehacer de pueblo. A través de nuestra historia política moderna hemos tenido varios ejemplos a todos los niveles políticos en los cuales funcionarios que han sido electos en representación de una colectividad política abandonan ésta para afiliarse a otra o para declararse independientes. Tales acciones están constitucionalmente protegidas por el derecho a la libre asociación y a la libertad de expresión. El mero hecho de que la posición de Senador del Hon. Sergio Peña Clos fuese creada en virtud del Art. III, Sec. 7 de la Constitución de Puerto Rico, *supra*, en nada cambia el derecho inalienable que tiene el señor Peña Clos, como cualquier otro Legislador, a la libertad de expresión y a la libertad de asociación que también garantiza nuestra Constitución.

Una vez el Legislador juramenta su escaño, ese legislador se debe antes que nada al pueblo que lo eligió y no al partido que lo nominó, irrespectivamente de la importancia que la disciplina de partido tenga en el ejercicio de sus funciones. Todos los legisladores de mayoría o minoría le responden al pueblo y son electos por el pueblo directamente. Aunque un legislador sea nominado por un partido político, su elección, sea por el mecanismo regular o por la aplicación de la ley de minorías, surge como resultado de los votos obtenidos por ese candidato; votos que pueden provenir de electores de todos los partidos políticos e inclusive de electores no afiliados.

Rechazamos por antidemocrática e inconstitucional la teoría de que existen dos (2) clases distintas de legislado-

res, unos que le responden al pueblo y otros que le responden al partido: todos le responden al pueblo por igual.

Al respecto, en el Informe de la Convención Constituyente, en el que se explica el propósito de la disposición sobre la representación minoritaria, claramente se establece el principio de que la representación se dirige hacia el mandato del pueblo que eligió al funcionario y no hacia el partido político.

Se dispuso en el informe referido que "[e]sta fórmula de garantía a las minorías se ha producido y recomendado por la Comisión como un medio de dar justa interpretación a la voluntad del pueblo *y no a como una concesión a partidos políticos*". (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2596 (1951).

Por otro lado, en *La Nueva Constitución de Puerto Rico*[2] se expresa en torno a la función del Legislador que:

> *El representante moderno no está obligado por instrucciones estrictas, pues no representa solamente a la mayoría que lo eligió, ni al distrito por el cual fue elegido, sino que representa a la totalidad del pueblo, y sólo responde ante su conciencia.* Con el sistema de representación proporcional este sano principio se vicia, al dar entrada oficial a los partidos y grupos políticos ... convirtiendo a [los legisladores] de un modo demasiado decidido y casi forzoso, de representantes del pueblo en funcionarios del partido a que deben su elección y al que por ello quedan excesivamente subordinados. (Énfasis suplido.)

El ejercicio de la libertad de conciencia al actuar como Legislador, en virtud del mandato concedido por el pueblo que lo elige, tiene un rango superior al del control que sobre un legislador pueda tener un partido político una vez se pasa del proceso de nominación al proceso postelectoral.

La Asamblea Constituyente estableció en la propia Sección 7 el orden sucesoral que deberá seguirse para completar las posiciones que se adicionan en beneficio de las minorías. Al respecto, se dispuso que se "considerarán, en

---

[2] *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Río Piedras, Ed. U.P.R., 1954, págs. 259-260.

primer término, [los] candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido". De esta forma la Constitución le arrebata a los partidos políticos el control absoluto sobre las posiciones que se añaden en virtud de la citada Sección 7.

Al respecto dispone la Sección 7, *supra*, que para seleccionar los candidatos adicionales de un partido de minoría, bajo las circunstancias que esta sección supone, se considerarán en primer término los candidatos por acumulación que no hubieren resultado electos, *en el orden de los votos que hubieren obtenido* y, en segundo término, sus candidatos de distrito que tampoco hubiesen resultado electos.

A tenor con el anterior mandato constitucional en las Elecciones Generales de 1992, la C.E.E. certificó como Senadores por Acumulación a los Hons. Sergio Peña Clos y Eudaldo Báez Galib. En relación con la naturaleza del cargo que deben ejercer estos funcionarios, se dispuso en la referida Sección 7 que "[l]os Senadores y Representantes adicionales cuya elección se declare bajo esta sección serán considerados *para todos los fines* como Senadores o Representantes por Acumulación". (Énfasis suplido.)

De esta forma, se quiso asegurar que no se crease un rango legislativo inferior en cuanto a las responsabilidades y prerrogativas propias del cargo que ocuparía el Legislador. Las consecuencias que pueda tener una subsiguiente desafiliación y nueva afiliación de un legislador ya electo a un partido político no pueden ser distintas para un Senador o Representante electo regularmente o electo por la aplicación de la ley de minorías, en virtud de la igualdad en todas sus prerrogativas consagrada en la propia Sec. 7 del Art. III de la Constitución, *supra*.

Podemos concluir que la forma en que advino Senador el Hon. Sergio Peña Clos no es determinante al momento de discernir si procede o no que se adicione un escaño al P.P.D. para completar la representación minoritaria según establece la Sec. 7, *supra*. La propia Constitución establece que

una vez en su cargo, tales funcionarios ejercerán sus funciones de igual forma que los demás legisladores.

Así quedó establecido un principio de igualdad que garantiza la libertad de actuación de estos legisladores, quienes en última instancia responden directamente al pueblo con cuyos votos lograron alcanzar su posición.

Las disposiciones de la Sec. 7 del Art. III, *supra*, sobre la representación de las minorías han de interpretarse conjuntamente con los derechos fundamentales de libertad de expresión y asociación garantizados por las Secs. 4 y 6, Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Éstas reconocen el derecho de un elector, sea o no Legislador, a afiliarse o desafiliarse de un partido político según los dictados de su conciencia.

Procede que en nuestra ineludible función como intérpretes de nuestra Constitución, y velando porque su espíritu democrático no se vulnere, sopesemos el alcance de las disposiciones, aquí en controversia, y determinemos en el más estricto balance de intereses cuál de estos derechos debe prevalecer.

## III

Por una parte nos encontramos frente a una disposición constitucional que es uno de los cimientos de nuestro sistema democrático de gobierno: la garantía de representación minoritaria. Por otra parte nos encontramos con dos (2) de los derechos constitucionales de más alta envergadura: la libertad de expresión y la libertad de asociación.

Al respecto dispone la Constitución en su Art. II, Secs. 4 y 6, *supra*, ed. 1982, págs. 265 y 274, respectivamente:

Sección 4.
No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios.
Sección 6
Las personas podrán asociarse y organizarse libremente para

cualquier fin lícito, salvo en organizaciones militares o cuasi militares.

Entendemos que para una solución justa de la controversia planteada ante nos debemos evaluar el alcance de una a la luz de las disposiciones de las otras.

Es incuestionable el alto sitial que tiene en nuestro ordenamiento la representación minoritaria. Sin embargo, es igualmente importante para nuestro desarrollo sociopolítico la más absoluta garantía de una libertad de expresión y de asociación.

Un análisis de la discusión que se originó en la Asamblea Constituyente, en ocasión de plantearse las distintas propuestas sobre la representación minoritaria, no nos arrojan luz sobre la controversia ante nos. Nada se dispuso en la redacción final del Art. III sobre su vigencia, y no aparece registro de que se hubiese discutido en el Pleno de la Asamblea Constituyente el sentir de los delegados sobre la aplicabilidad, durante la totalidad del cuatrienio, de las disposiciones sobre la representación de las minorías más allá del momento en que se certifiquen los legisladores electos conforme al resultado electoral.

Es pertinente señalar que, en el orden natural de las cosas, un candidato nominado por un partido político que resulta electo suele mantenerse fiel a los postulados de dicho partido por la totalidad del cuatrienio. Lo que no podemos garantizar es que dentro de los constantes cambios económicos, sociales y políticos, y dentro del dinamismo político saludable para nuestro pueblo, *esto tenga que ser así siempre.*

Si los padres de la Constitución hubieran querido perpetuar la afiliación política de un legislador de minoría durante el cuatrienio, debieron incluir como causa de expulsión de éste dicho cambio de afiliación, o debieron, al menos, establecer en la citada Sec. 7 del Art. III que en tal eventualidad se adicionaría otro legislador para sustituir

el que se desafilió. Tal disposición no fue incorporada a nuestra Constitución.

Debemos observar en su justa perspectiva el significado real de la determinación a la que llega el Tribunal mediante la sentencia en el caso de autos. En primer lugar, se cambia por fíat judicial la composición de la Legislatura. Pero más peligroso aún, se abren las puertas para que en el futuro permee la inestabilidad representativa en nuestra Rama Legislativa.

Al respecto dispone la Sec. 9 del Art. III de la Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 340, que:

> Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, *podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia*, en la Sección 21 de este Artículo. (Énfasis suplido.)

El que un legislador cambie de afiliación política claramente no da lugar a su expulsión del cuerpo legislativo, según la Constitución. Este Tribunal, buscando una forma de circunvenir esta clara disposición constitucional, y yendo más allá de la certificación de los senadores que resultaron electos por mayoría y minoría en los comicios de 1992, pretende adicionar otro senador a la plantilla del Senado sin un fundamento en la Constitución para así hacerlo.

Al decidir que las disposiciones sobre la representación de las minorías al momento cuando se certifican los resultados electorales representan una camisa de fuerza que congela durante cuatro (4) años la plantilla legislativa a base de afiliación política, le restamos vigor a nuestra dinámica democrática y política e inclusive permitimos que en el futuro se debilite la posición de las minorías. Imaginemos por un momento que la situación del caso de autos

fuese a la inversa: que un legislador de la mayoría se cambie a la minoría. ¿Podríamos eliminar a un legislador de minoría previamente adicionado por el mero hecho de que la minoría ya no lo "necesita" para completar la cuota que por ley se le garantiza? ¿Podría la mayoría exigir una plaza adicional para crear un nuevo balance político?

En caso de que el propio Senador Peña Clos decida reingresar al P.P.D., ¿se eliminaría al nuevo integrante que por virtud de la decisión de la mayoría se ha adicionado a la Legislatura? ¿Qué ocurriría si el nuevo Senador adicionado por virtud de la decisión de este Tribunal posteriormente se cambia al partido de mayoría? ¿Concederíamos un nuevo escaño a la minoría?

Peor aún, en caso de que la mayoría perdiese sus dos terceras (2/3) partes por el cambio de un legislador de un partido a otro, ¿se eliminarían *todos los legisladores que entraron a sus funciones en virtud de la Sec. 7*, y que fueron debidamente juramentados para *todos los fines* como senadores o representantes por acumulación porque ya ésta no es aplicable?

Entendemos que un ponderado análisis de las interrogantes anteriormente planteadas nos obliga a concluir que en efecto la controversia ante nos no fue prevista por la Asamblea Constituyente. Sin embargo, la garantía de la representación de las minorías que permea en nuestra Constitución está debidamente asegurada al determinar que ésta rige al momento de certificarse los resultados electorales y en virtud de ellos constituirse la Asamblea Legislativa. De esta forma también garantizamos el inquebrantable derecho a la libertad de expresión y a la libre asociación que son estandartes de la democracia puertorriqueña. Lo que ocurra luego de las elecciones no es ya del control de los partidos políticos. Un gobernador, un alcalde, un legislador, puede desafiliarse del partido que lo nominó y afiliarse a otro partido y por ello no pierde su posición de servidor público. No procede adicionar nuevas

posiciones electivas ante estas situaciones irrespectivamente de los partidos políticos involucrados. El remedio en tales situaciones, si alguno, lo tiene el pueblo al juzgar positiva o negativamente lo ocurrido. Lo contrario representaría una coacción a la democracia. Concurrimos con la sentencia al mantenerse en su escaño al Senador Peña Clos, pero disentimos al requerirse que se adicione otro Senador a la plantilla del Senado.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

*Otra vez se menoscaba el valor del sufragio electoral y triunfa la PARTIDOCRACIA sobre la DEMOCRACIA.*

La sentencia mayoritaria que ha sido producto de tres (3) ponencias vulnera principios y valores muy preciados que sirven de fundamento a nuestro diseño constitucional-electoral. Mediante la suma de criterios disímiles resuelve que un legislador de minoría puede dar la espalda a *su electorado, desvincularse voluntariamente* del *partido* que oficialmente *promovió* su candidatura y *viabilizó su elección por adición*, afiliarse al de mayoría y, aún así, continuar en el cargo. Ofrece, como único remedio, el *absurdo extraconstitucional de crear un nuevo escaño* para el partido al que pertenecía el incumbente original.

Al aspirar a su nominación para el Senado, el Lcdo. Sergio Peña Clos *no lo hizo como candidato independiente*; menos como candidato del *Partido Nuevo Progresista (en adelante P.N.P.)*. Actuó como "elector *afiliado*" del *Partido Popular Democrático (en adelante P.P.D.)*, prestó *juramento* de que así aceptaba ser postulado *como candidato*, que *acataría* su Reglamento Oficial y *cumpliría* con los demás requisitos constitucionales y legales aplicables.

Desde su *génesis*, su candidatura estuvo *condicionada, cualificada* y *atada* al *requisito* de ser miembro *bona fide*, afiliado al P.P.D. De hecho, el Art. 4.014 de la Ley Electoral

de Puerto Rico requiere que el aspirante "figur[e] en el registro de electores afiliados del Partido", bajo cuya insignia se presenta al pueblo. 16 L.P.R.A. sec. 3164.

En nuestro diseño constitucional-electoral hay una correlación recíproca que en virtud de esos requisitos legales y del juramento se convierte en un *pacto de dimensión tripartita.* Éste se proyecta entre el *candidato, los electores* que suscriben inicialmente su petición de primarias y luego votan por él y por el *partido político* al cual el candidato y los electores pertenecen. *Ese pacto se renueva y ratifica el día de los comicios generales* y, con la elección del candidato a la Legislatura, *se extiende durante todo el cuatrienio.* El elemento jurídico y moral *constante en esa relación es la confianza de los electores y el compromiso del candidato de que su afiliación, aspiración y elección es legítima, personal e intransferible.* En consecuencia, la expectativa y confianza de los electores y el partido concernido de conservar todos sus escaños durante el cuatrienio es una premisa constitucional cognocible.

La naturaleza especial y el interés público del que está revestido en todas sus etapas la elección de un legislador, reclama su más estricta aplicación y observancia como único mecanismo para no subvertir *la razón lícita y seriedad* en que se funda *una candidatura bajo un partido político.* Cuando en el ejercicio de su respetable derecho a la libre expresión y asociación, *por decisión propia*, un legislador se desafilia del partido político por el cual figuró en la papeleta y fue electo, realmente da la espalda y anula el derecho de expresión y asociación, *también respetables*, de los miles de electores que depositaron sus votos y confianza en él como candidato *de determinado partido.*

El Poder Judicial no puede convalidar y dar por bueno semejante vicio de índole legal y moral contrario a la Constitución y a la Ley Electoral de Puerto Rico. El licenciado Peña Clos no representa ya el compromiso en que sus electores fundamentaron su consentimiento. *Su permanencia*

*en un escaño, como Senador del P.N.P., ofende entonces la
letra y el espíritu de la Constitución y de la Ley Electoral de
Puerto Rico.* Más que nada, subvierte el proceso de candi-
daturas, el pacto tridimensional expuesto y, sobre todo,
convierte la Constitución *en una farsa* que mina la con-
fianza pública y niega al proceso electoral su verdadera
esencia como instrumento útil de estabilidad social-
ciudadana.

*La solución del Tribunal es ilógica, trágica y contraria a
un sistema de gobierno democrático.* El menoscabo del
mandato expresado en las últimas elecciones generales es
*directo y sustancial.* En síntesis, por fíat judicial, *primero,*
altera la composición numérica e ideológica del Senado que
han sido instituidas por la voluntad soberana del pueblo.
*Segundo,* otorga al P.N.P. un escaño senatorial que perte-
nece al P.P.D. *Tercero, añade* un senador *más* sin que exista
vacante alguna entre los escaños de la mayoría del P.N.P.,
o sea, permite que el Senador Peña Clos —ahora miembro
de la mayoría del P.N.P.— *sin tener derecho,* retenga un
escaño que *por su origen y naturaleza* correspondió a la
minoría representada por el P.P.D. *Cuarto,* consagra una
norma muy peligrosa que atenta contra la estabilidad y el
balance legislativo que debe existir hasta las próximas
elecciones generales. *Quinto, ha sacrificado principios ele-
mentales,* y en aras de lograr un resultado que, *visto super-
ficialmente no revela partes perdidosas, ha consagrado la
regla de que el cambio de lealtades partidistas por la deci-
sión unilateral de un legislador puede violentar la volun-
tad electoral y trastocar los derechos —aquí de las mino-
rías— sin sujeción alguna a la Constitución y a la Ley
Electoral de Puerto Rico.*

El *único ganador neto aparente es el partido político de
mayoría actual, el P.N.P.; el perdedor, más que la minoría
del P.P.D., la democracia puertorriqueña, el sistema de go-
bierno que juramos defender.* Elaboremos.

I

Según manda el Art. III, Sec. 2 de nuestra Constitución, L.P.R.A., Tomo 1,(¹) con las Elecciones Generales de 3 de noviembre de 1992, el Senado quedó constituido de veinte (20) escaños del P.N.P., seis (6) del P.P.D. y uno (1) del Partido Independentista Puertorriqueño (P.I.P.), para hacer un total de veintisiete (27) senadores. Se activó, pues, la fórmula que garantiza la representación de las minorías a través de los partidos políticos cuando uno solo elige más de 2/3 partes. Art. III, Sec. 7, Const. E.L.A., *supra*.(²) La Comisión Estatal de Elecciones, por adición, certificó electos como Senadores por Acumulación del P.P.D. a los Lcdos. Eudaldo Báez Galib y Sergio Peña Clos.

El licenciado Peña Clos se desafilió voluntariamente del *caucus* del P.P.D. el 12 de octubre de 1993. Luego de haber fungido como senador independiente, el 3 de abril de 1995 ingresó oficialmente al *caucus* del P.N.P. con el beneplácito de sus miembros.

Ante esta situación, el P.P.D. y siete (7) de sus senadores reclamaron judicialmente que el Senador Peña Clos ocupaba un escaño senatorial que les pertenecía como minoría. Adujeron que su desafiliación e ingreso a la mayoría del P.N.P. creó un desequilibrio en el cuerpo legislativo en contravención de la Sec. 7 del Art. III de la Consti-

---

(¹) La Sec. 2 del Art. III dispone:

"El Senado se compondrá de veintisiete Senadores y la Cámara de Representantes de cincuenta y un Representantes, excepto cuando dicha composición resultare aumentada a virtud de lo que se dispone en la sección 7 de este Artículo." L.P.R.A., Tomo 1, ed. 1982, pág. 334.

(²) El Art. III, Sec. 7 de la Constitución, L.P.R.A., Tomo 1, provee un mecanismo para que, cuando en las elecciones generales el partido de mayoría elija más de dos terceras (2/3) partes de los miembros de la Legislatura, se garantice *sustancialmente* a cada partido minoritario una representación proporcional a la totalidad de su fuerza electoral, pero nunca en exceso de una tercera parte del número original de legisladores en la cámara correspondiente. O. Resumil de Sanfilippo y Faría González, *La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión*, 65 Rev. Jur. U.P.R. 329, 338 (1996).

tución y anuló la última expresión y voluntad del pueblo ejercida mediante el sufragio universal.

Oportunamente, el tribunal de instancia (Hon. Carmen Rita Vélez Borrás, Juez), declaró sin lugar la demanda al concluir que no correspondía al foro judicial decidir si debía expulsarse de su escaño al Senador Peña Clos. Por plantear una cuestión constitucional sustancial, acogimos la apelación del *P.P.D. et al.*, en la cual nos piden que reestablezcamos el balance *original* visualizado en la Constitución, según las últimas elecciones.

## II

Concentraremos en las cuestiones sustantivas, sin entrar en una innecesaria y extensa disquisición sobre los planteamientos de legitimación activa, academicidad y cuestión política.

Sin duda la controversia es *justiciable*. Basta recordar que la Sec. 9 del Art. III de la Constitución, *supra*, que dispone que las cámaras legislativas serán los únicos jueces de la capacidad legal de sus miembros y el poder de expulsión, no margina ni priva a este Tribunal de ejercer su jurisdicción como intérprete final de la Constitución. Definir sus contornos, entre ellos, los requisitos de sus miembros, los derechos de las minorías y las facultades del Poder Legislativo, es prerrogativa exclusiva nuestra. Como resolvimos en *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 758 (1977), no estamos ante un "postulado del derecho natural, ... la concesión irrestricta de tan vasto poder a un parlamento está preñada *de peligros para las minorías, la regla del imperio de la ley y la salud de la democracia*". (Énfasis suplido.) Así, en *Tonos Florenzán v. Bernazard*, 111 D.P.R. 546 (1981), decidimos que la ausencia del requisito de edad mínima fijada en la Constitución al comenzar un cuatrienio descualificaba *ex proprio vigore* a un repre-

sentante electo. Entre otros fundamentos nos animó el no menoscabar el texto constitucional y evitar "que en épocas de crudo partidismo político, la simple voluntad de una mayoría parlamentaria impusiera distintas exigencias sobre la capacidad de sus miembros, lo cual propiciaría un potencial abuso y privación de derechos". *Tonos Florenzán v. Bernazard*, supra, pág. 551.

No obstante estos precedentes, la mayoría del Tribunal se niega a ordenar que el licenciado Peña Clos cese en el cargo al suscribir el razonamiento del foro de instancia de que ello significaría la expulsión mediante fíat judicial de un senador debidamente juramentado. *Discrepamos.*

La abstención de este foro tendría sentido jurídico si la mayoría senatorial del P.N.P. hubiese estado en disposición, siquiera, de investigar la capacidad legal del licenciado Peña Clos para permanecer ocupando un escaño. *No fue así.* El expediente legislativo demuestra con absoluta *claridad* que *sin reservas* lo aceptaron y admitieron formalmente como Senador *afiliado a su caucus (P.N.P.)*, al extremo de que se le sustituyó en una comisión que, por su cambio, quedó sin representación minoritaria del P.P.D. Surge, además, *como hecho consumado*, que su ingreso en el P.N.P. generó un aumento sustancial en el presupuesto asignado a su oficina, incremento en su personal y participación en otras comisiones. Incluso preside una, privilegio que tradicionalmente se reserva para los miembros de la mayoría.

En *resumen*, la realidad escueta es que la mayoría senatorial del P.N.P. *tomó la decisión final y definitiva* de que no procedía expulsar al Senador Peña Clos. *Desde el punto de vista de las ventajas político-partidistas que supone, esa decisión es explicable; desde la perspectiva jurídico-constitucional, es judicialmente revisable.* No cabe, pues, argüirse con validez que nuestra intervención, en virtud de la demanda del P.P.D. *et al.*, es contraria a la Constitución.

## III

Se impone una página de historia. A raíz de las sólidas victorias electorales del P.P.D. durante la década de 1940 y 1952, su liderato democrático, presidido por Don Luis Muñoz Marín, se preocupó genuinamente por la escasa representación legislativa de los *partidos minoritarios*.([3])

Al respecto, en la Convención Constituyente se fraguó "la idea de incluir en la Constitución medidas para garantizar representación minoritaria en la Asamblea Legislativa de Puerto Rico, aunque los candidatos de los *partidos minoritarios* no obtuviesen los votos para salir electos". (Énfasis suplido.) *Fuster v. Busó*, 102 D.P.R. 327, 331 (1974).([4]) Se adoptó así el novedoso método —desarrollado

---

([3]) "En cuanto a la composición de la Asamblea Legislativa, el resultado de esas victorias electorales del Partido Popular fue el siguiente. En el cuatrienio de 1944 al 1948, 17 de los 19 senadores pertenecían a dicho partido y dos a la oposición, y en la Cámara de Representantes el partido mayoritario obtuvo 37 escaños y la oposición solamente dos. En el cuatrienio de 1948 al 1952 la situación en el Senado fue idéntica a la antes mencionada y en la Cámara de Representantes el Partido Popular obtuvo 38 de los escaños y la oposición solamente uno." *Fuster v. Busó*, 102 D.P.R. 327, 330 (1974).

([4]) Es interesante señalar cómo en *Fuster v. Busó*, supra, *con visión casi profética, el Partido Independentista Puertorriqueño sostuvo*: "Los escaños pertenecen por definición al Partido de minoría que los obtuvo en las elecciones generales. No hay otra forma para evitar que se desvirtúe el propósito de la Constitución. Hemos visto que los debates de la Convención Constituyente que culminan con la aprobación del Artículo III, sección 7, mantienen que serán los partidos de minoría los que representarán la opinión de los grupos minoritarios en Puerto Rico. Diario de Sesiones de la Convención Constituyente de Puerto Rico, Edición Equity, 1961, página 2023–2034, tomo 3. *Por tanto, es imprescindible que las personas que estén ocupando los escaños por adición de cualquier partido de minoría pertenezcan a dicho partido y que cuando un legislador de esta clase deje de pertenecer al partido de minoría en cuestión, el escaño revierta al partido para que pueda ocuparlo una persona que cumpla con todos los requisitos.* Sólo así se puede asegurar que el partido de minoría va a mantener el porciento de representación que la Constitución le otorga para cumplir correctamente su función parlamentaria. El ejemplo más claro sería el siguiente: la razón de ser del Artículo III, Sec. 7, de la Constitución es asegurar una oposición al partido de la mayoría que haya electo más de dos terceras partes de los miembros de cualquiera o ambas cámaras; *si un representante por adición de un partido de minoría abandona su partido y se hace miembro del partido de la mayoría y retiene su escaño*, ¿cuál sería la efectividad de la disposición constitucional? Vemos claramente cómo tiene que ser requisito indispensable para que una persona ocupe un escaño por adición el que sea miembro del partido de la minoría que obtuvo dicho escaño y que debe declararse por este Honorable Tribunal para que no quede duda alguna ni *pueda frustrarse la Constitución de Puerto Rico que los escaños por adición pertenecen a los partidos de minoría que los obtuvieron como resultado de una elec-*

por el delegado Lcdo. Luis Negrón López— contenido hoy en la Sec. 7 del Art. III, *supra*. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 146.

El legajo de la Asamblea Constituyente revela que, aunque el delegado Negrón López estaba convencido de la sabiduría de su fórmula, había que "guardar el más alto reconocimiento *al deseo de los electores*" y *bajo ningún concepto podía variarse su voluntad manifiesta en las urnas.* (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1302 (1951).

Estos principios cardinales prevalecieron en *Fuster v. Busó*, supra, pág. 340, en el cual *inequívocamente* resolvimos que la Sec. 7 del Art. III, *supra*, estaba *atada* y "les conced[ía] determinados *escaños legislativos a los partidos de minoría*". (Énfasis suplido.)

Cónsono con esa intención y espíritu constitucional, *P.P.D. v. Gobernador*, 111 D.P.R. 8 (1981), reconoció como *interés apremiante de la más alta jerarquía, mantener y proteger el mandato electoral, resultado de la última elección general.* En su opinión *confirmatoria*, el Tribunal Supremo federal sostuvo la validez del sistema establecido en la Ley Electoral de Puerto Rico mediante el cual, el escaño vacante por un distrito se llena con un miembro *del mismo partido político* al cual pertenecía el incumbente original. Decidió expresamente que ello servía para proteger el mandato de la última elección y preservar el balance legislativo hasta la próxima elección general. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 13 (1982). A igual conclusión llegó el Tribunal de Circuito de Apelaciones de Estados Unidos para el Primer Circuito al sostener que existe, sobre todo, "la necesidad de preservar el balance político obtenido en las últimas elecciones generales". (Traducción nuestra.) *Cintron-Garcia v. Romero-Barcelo*, 671 F.2d 1, 5 (1er Cir. 1982).

---

*ción general*". Alegato, págs. 17–18.

El respeto judicial al principio constitucional que garantiza un número mínimo de escaños legislativos a *los partidos minoritarios, sin menoscabar el deseo del pueblo,* conlleva *no variar ni desbalancear su composición ideológica y numérica, hasta la celebración de las próximas elecciones generales. P.P.D. v. Gobernador,* supra, pág. 23.

Así lo reconoce la sentencia mayoritaria. Sin embargo, en contravención de estos mismos principios, incurre en una anomalía constitucional insalvable. En sus distintas dimensiones, ésta destruye la composición ideológica y numérica legislativa y, además, *amplía la ventaja del P.N.P.*

## IV

El desarrollo constitucional ha estado inexorablemente vinculado a los partidos políticos.

En nuestra democracia los partidos políticos son indispensables para su funcionamiento. Están investidos de poderes cuasi gubernamentales. Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, formulan programas de administración y promueven candidatos a puestos políticos. *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 638 (1984), y casos allí citados.

En esa trayectoria, históricamente la elección a cargos públicos ha sido una *combinación inseparable* de las cualidades del candidato, su afiliación partidista e ideología política. En nuestra *peculiar situación*, los partidos no sólo crean opinión pública y proponen programas de gobierno, sino que representan las clásicas posiciones sobre el *status político*; son los agentes principales aglutinadores de aspecto tan transcendente, cuyo efecto puede ser determinante al momento del elector emitir su voto.

En la dinámica electoral puertorriqueña, los candidatos a puestos electivos (salvo los independientes) realizan su campaña particular bajo el emblema, auspicio y compromiso ideológico de los postulados y programas del

partido.(⁵) Esa candidatura conlleva la autorización para figurar en la papeleta electoral *bajo* "[e]l nombre e insignia de un partido [que] son los timbres heráldicos que transmiten y despiertan en el electorado la noción de su programa, sus ideales, sus principios, su historia y sus líderes". *Democratic Party v. Tribunal Electoral*, 107 D.P.R. 1, 15–16 (1978). *Estas candidaturas no se dan en el vacío, sino que están inexorablemente atadas a un partido político específico.* Como miembros y representantes electos de la colectividad política, los candidatos están comprometidos a adelantar sus objetivos. Ante el electorado se presentan como representantes *legítimos de ese partido*, cualificados para ocupar el puesto al que aspiran individualmente.

Ciertamente, al emitir su voto el elector no sólo considera los atributos personales del candidato, *sino su identificación, compromiso y preferencia con una filosofía política en particular* y un programa, según fueron adoptados por el partido a que pertenece. Nace entonces un compromiso vinculante tripartita, no sólo moral, sino jurídico-constitucional entre candidato, elector y partido. Este presupone que no será alterado y que estará *vigente durante todo el término de duración del cargo para el cual es electo.*(⁶)

*P.P.D. v. Gobernador*, supra, confirmado por el Tribunal

---

(⁵) Desde 1952, fecha de nuestra Constitución, se han celebrado once (11) elecciones generales. De éstas, solamente en una ocasión, un candidato independiente a un puesto público resultó electo. Nos referimos a la elección del señor Santos Ortiz electo como Alcalde del Municipio de Cabo Rojo, en 1988, sin figurar en la papeleta bajo la insignia de un partido. F. Bayron Toro, *Elecciones y Partidos Políticos de Puerto Rico*, Mayagüez, Ed. Isla, 1977, págs. 337–338.

(⁶) Tanto el Reglamento del Partido Popular Democrático, vigente para las elecciones de 3 de noviembre de 1992, como el actual, imponen "[a] cada miembro afiliado del Partido electo para un puesto público o para un cargo de liderato en la colectividad, un *compromiso de respeto* a la Constitución del Estado Libre Asociado y de guardar una conducta personal ejemplar que no lesione la imagen y *los intereses del Partido*". (Énfasis suplido.) Art. 150, Sec. 2.

A modo comparativo, el Reglamento actual del Partido Nuevo Progresista establece:

"Todo miembro del Partido aceptará y defenderá la Declaración de Propósitos y el Programa de Gobierno del Partido. Sin embargo, podrá en cualquier reunión de los organismos oficiales del Partido o por carta dirigida al Presidente o al Secretario del Partido proponer cambios al Programa, pero deberá siempre acatar el vigente." Art. 5.

Supremo federal en *Rodriguez v. Popular Democratic Party*, supra, recogió estos principios. Concluimos que. el procedimiento para llenar una vacante en el cargo de Senador o Representante por un distrito, según la Ley Electoral de Puerto Rico. vigente, *no adolecía de vicio constitucional alguno.*([7]) Sostuvimos:

El referido Art. 5.006 muestra con inconfundible relieve como propósito esencial el de proveer manera para que el partido que vaca un escaño en el Senado o en la Cámara por muerte o *renuncia* del incumbente, o por cualquier otra causa, *pueda restablecer el balance de poder legislativo, sustituyéndolo con uno de sus miembros bona fide.* Que la premisa dominante en dicho artículo es la *sustitución del incumbente original por otro miembro del mismo partido político que lo eligió,* se desprende del texto del segundo párrafo de dicho artículo que concede una clara opción preferente "al partido al cual pertenecía el legislador del escaño vacante" para presentar una candidatura "para llenar el mismo", y solo por vía de excepción, si dicho partido no presenta una candidatura en término de 60 días, se admiten otros candidatos independientes. *El propósito es mantener el balance de poder entre partidos bajo el cual se constituyó la Cámara, no es alterarlo ni modificarlo.* ... Está[n] preservada[s] la autonomía del partido para cubrir el escaño vacante. ... [y] la autonomía del partido para seleccionar, por los medios provistos en sus reglas internas, el candidato que habrá de presentar para cubrir el escaño vacante. ...

[L]a Ley ha diseñado el procedimiento *como exclusivamente de sustitución del legislador por el partido que ganó su escaño en los comicios generales, quitándole toda intención de cambiar la composición del cuerpo legislativo determinado en dichas elecciones generales.*

[Esto es así porque] *la vacante pertenece al partido del legis-*

---

([7]) Originalmente la Asamblea Constituyente optó por desvincular del partido el escaño de un legislador *de distrito.* Aún así, determinó que las vacantes de los *electos por acumulación* pertenecieran al partido correspondiente y se cubrirían por el presidente de la cámara concernida "a propuesta del partido político a que pertenecía el Senador o Representante cuyo cargo estuviere vacante, con un candidato seleccionado en la misma forma en que lo fue su antecesor".

Ese enfoque, plasmado en el texto original de la Sec. 8 del Art. III de la Constitución, L.P.R.A.; Tomo 1, cambió con la enmienda aprobada mediante referéndum en 1964. Desde entonces las vacantes en los legisladores de distrito se cubrirán como se disponga por ley. El estatuto actual inequívocamente establece una preferencia hacia el partido político.

*lador que la provocó.* (Énfasis en el original suprimido y énfasis suplido.) *P.P.D. v. Gobernador*, supra, págs. 13–17.([8])

Como expusiera en su voto particular el entonces Juez Asociado de este Tribunal, Señor Irizarry Yunqué, no se debate "la realidad histórica de que se ha respetado siempre el principio de que *los escaños legislativos, salvo cuando se trate de legisladores elegidos como candidatos independientes, pertenecen a los partidos políticos*". (Énfasis suplido.) *P.P.D. v. Gobernador*, supra, pág. 27.

La expresión de la voluntad del pueblo mediante sufragio universal *impone a todo candidato electo por un partido político* la obligación de abogar por una sana administración pública y adelantar los planes sociales, económicos y políticos de su partido que se sometieron al electorado. Conscientes de que la democracia se nutre de la libre expresión y el intercambio de ideas en un ambiente de respeto mutuo, no cabe imponerle a los candidatos electos una *disciplina partidista férrea* y *absoluta* que ahogue sus conciencias y libertad de expresión. En el ejercicio de su independencia de criterio, como veremos, la opinión de un legislador sobre determinado asunto puede, en ocasiones, estar en conflicto con la de su partido o *caucus*, ello *sin temor de ser castigado o expulsado del escaño*. Véase M.L. Stokes, *When Freedoms Conflicts: Party Discipline and the First Amendment*, XI J. Law Politics 751 (1995).

> Un gobierno representativo requiere dar a los legisladores la más amplia latitud para expresar sus puntos de vista en asuntos de política. ... Los legisladores tienen la obligación de asumir posiciones sobre asuntos políticos controversiales de forma

---

([8]) Allí en nuestro *voto concurrente*, a los fines de paralizar los efectos de la Sentencia del Tribunal de instancia, "conclui[mos] que *es el partido político afectado por la vacante quien tiene derecho a cubrirla* mediante la presentación de una candidatura en tiempo. Presentada la misma, no cabe estimar que *pueden nominarse otros candidatos desafiliados* a ese partido para participar en la elección. (Énfasis suplido.) *P.P.D. v. Gobernador*, 110 D.P.R. 783, 790 (1981).

Subsiguientemente, en *P.P.D. v. Gobernador*, supra, págs. 33–45, reiteramos ese criterio, aunque discrepamos de la interpretación estatutaria mayoritaria, pues a nuestro juicio exigía una elección *especial*.

que su *electorado* esté adecuadamente informado y mejor capacitado para evaluar sus cualificaciones para el cargo; *también para que estén representados en los debates gubernamentales por la persona que seleccionaron como su representante.* (Traducción nuestra y énfasis suplido.) *Bond v. Floyd*, 385 U.S. 116, 136–137 (1966).

Sin embargo, la situación de autos es distinta. Aquí el licenciado Peña Clos, Legislador del P.P.D., *renunció*, esto es, se desvinculó totalmente de su partido de origen, ingresó y juró lealtad a los postulados de otro (P.N.P.).

Este dato es crucial y decisivo. El requisito de pertenecer al partido político (*caucus*) para ocupar un cargo legislativo no significa que no haya espacio de conciencia para la disidencia, la crítica interna constructiva, la discrepancia razonable, etc. Ello puede manifestarse con el voto a favor o en contra, con relación a determinado asunto, resolución, proyecto de ley, propuesta de referéndum o plebiscito. En tales situaciones, el Legislador puede también optar por abstenerse de participar e incluso consignar un voto expositivo de su criterio personal. Ahora bien, cuando las diferencias se profundizan al extremo de ser irreconciliables o *su ideario ideológico —estadidad, autonomía o independencia— cambia,* le corresponde tomar decisiones de trascendencia al espíritu. Ha de estar conciente que habrá de afectarle su incumbencia en el escaño legislativo por el hecho mismo de estar ocupándolo *como representante de los electores de determinado partido.* Nada impide, pues, que en el ejercicio de su derecho a la libre expresión y asociación *cambie* su *enfoque e ideal y opte por desafiliarse.* De ese modo da riendas al libre albedrío. Sin embargo, esa misma conciencia impide que, una vez afiliado a otro partido, continúe *simultáneamente* en el escaño que correspondía a su partido original.

*En el caso de autos, la desafiliación del licenciado Peña Clos rompió el compromiso con los electores que lo eligieron bajo la candidatura partidista original del P.P.D. Su respetable derecho a la libre expresión como Legislador quedó*

*subordinado a los derechos —también respetables— a la libre expresión de los miles de electores que lo eligieron en atención, precisamente, a su vinculación y candidatura con ese partido político y no con el P.N.P.*

## V

Los reclamos del P.P.D. en este recurso se fundamentan en los principios de que la composición ideológica del cuerpo legislativo, según las últimas elecciones generales, *no puede alterarse hasta la celebración de la próxima elección general, y que los escaños legislativos, excepto los de candidatos independientes, pertenecen a los partidos políticos.*

La sentencia mayoritaria, como por arte de magia, modifica la composición ideológica y la voluntad electoral expresada por el pueblo en los comicios pasados. Al resolver que procede la certificación de la elección de un senador adicional, afiliado al P.P.D., intenta mantener el mandato electoral de dos (2) senadores del P.P.D. según la Sec. 7 del Art. III, *supra.* Sin embargo, al reconocer que el licenciado Peña Clos tiene derecho a *continuar, inexorablemente, altera dicho mandato, pues aumenta en uno (1) los miembros de senadores afiliados al caucus del P.N.P.*

La tabla siguiente ilustra de forma *dramática* esta alteración:[9]

---

[9] Combina las Tablas I y VII incluidas en el citado artículo de Resumil de Sanfilippo y Faría González, págs. 343 y 356, respectivamente.

| Situación | Senadores Electos | | Senadores por adición | | Total de Senadores | Representación Porcentual de la Mayoría |
|---|---|---|---|---|---|---|
| | Mayoría | Minoría | | | | |
| Al momento de constituirse el Senado | 20 (PNP) | 7 — 6(PPD) / 1(PIP) | 2 (PPD) | | 29 | 68.96 |
| Al momento de desafiliarse el Sen. Peña Clos del PPD y quedarse independiente | 20 (PNP) | 7 — 6(PPD) / 1(PIP) | 2 | 1(PPD) / 1(Indep) | 29 | 68.96 |
| Al momento de afiliarse el Sen. Peña Clos al PNP | 21 (PNP) | 7 — 6(PPD) / 1(PIP) | 1 (PPD) | | 29 | 72.41 |
| Al momento de la Sentencia de este Tribunal | 21 (PNP) | 7 — 6(PPD) / 1(PIP) | 2 (PPD) | | 30 | 70.00 |

Con *absoluta objetividad,* la tabla pone de manifiesto cómo la nueva composición ideológica acentuó la mayoría absoluta de dos terceras partes (2/3) que tenía el P.N.P. y el extraordinario poder para, sin necesidad de contar con el voto de las minorías, sancionar o expulsar a uno de sus miembros al amparo de la Sec. 9, Art. III de nuestra Constitución, *supra.* Esta ventaja subsiste, no obstante la vacante creada con la expulsión del Lcdo. Nicolás Nogueras decretada el 25 de abril pasado.

De igual modo aumenta el presupuesto del Senado y, como corolario, automáticamente también el asignado al P.N.P., con las consabidas oportunidades y ventajas sobre el área de recursos humanos y al cubrir las comisiones senatoriales.[10] En contraste con ello, la representación de la minoría P.P.D. y su presupuesto se mantienen *igual. ¿Es esto un balance constitucional? ¿Es justo?* Más aún, en comparación con el *nuevo total de senadores,* incrementa la representación *porcentual* de la mayoría del P.N.P. y disminuye la de la minoría del P.P.D., ello en claro menosprecio del deseo electoral y el espíritu de la Constitución.

---

[10] Conforme a la Resolución del Senado Núm. 3, según enmendada, el Senado tiene veintitrés (23) comisiones permanentes. Se designará, entre el total de miembros de cada comisión, por lo menos un miembro de cada partido de minoría. Regla 12, Sec. 12.1 del Reglamento del Senado.

Otorgarle el escaño senatorial del licenciado Peña Clos al P.N.P. —cuando éste *le pertenece al P.P.D.*— es contrario a lo resuelto en *P.P.D. v. Gobernador*, supra, confirmado por el Tribunal Supremo federal en *Rodriguez v. Popular Democratic Party*, supra. *En otras palabras, no es constitucionalmente permisible que un senador, afiliado al caucus de un partido, ocupe un escaño que pertenece a otro partido.*

## VI

Nos preocupan las consecuencias *negativas* de esta decisión. *Representan un peligroso precedente judicial que atenta contra la tradicional estabilidad democrática del país.*[11]

Sus hipótesis son insostenibles. Como justificación se afirma que una vez jurados, los legisladores responden a todo el pueblo. *Aparece, entonces, lo que podemos caracterizar como la desafiliación instantánea y ficticia de un legislador.* Se configura así el Legislador sui géneris, que bajo la ficticia pretensión de pertenecer a todo el pueblo, no se debe a ningún partido político ni a nadie. Se aduce, además, que aunque sea electo bajo la insignia de un partido, su elección puede haber sido el resultado de votos de electores de todos los partidos políticos, incluso de los no afiliados. Se habla de un libre albedrío a ultranza, que per-

---

[11] A modo de interrogantes:

¿Qué sucedería si el Legislador que cambió de partido —Senador Peña Clos— decide regresar y es aceptado por el *caucus* del partido del cual se desvinculó? ¿Procedería entonces la expulsión inmediata del nuevo Legislador certificado a raíz de su desafiliación? ¿Quién lo expulsaría: el foro legislativo o el judicial? ¿Por qué razón? Si el cuerpo legislativo se abstiene de expulsarlo y no se presenta acción judicial alguna, ¿se estaría violando la citada Sec. 7 del Art. III que fija el número máximo de miembros de los partidos minoritarios?

¿Qué sucedería si el Legislador que cambió de partido se desvincula de la mayoría parlamentaria y se afilia al *caucus* de otro de los partidos de minoría? ¿Se certificará un nuevo Legislador afiliado al partido mayoritario? Si se ha activado la Sec. 7 del Art. III, *supra*; ¿procederá la expulsión de uno de los legisladores que haya sido certificado al palio de dicha cláusula constitucional? ¿Quién lo expulsaría: el foro legislativo o el judicial? ¿Por qué razón? De no ser expulsado, ¿se estaría violando la citada Sec. 7 del Art. III en cuanto que establece el número máximo de miembros de los partidos minoritarios?

mite al Legislador desconectarse e ignorar que fue electo precisamente bajo la candidatura de un partido político en particular.

Semejante ficción atribuye al voto un valor, sólo hasta el día en que sea contado. De ser correcta la tesis de que el legislador, una vez jurado, representa a todo el pueblo: ¿Cómo explicar que la organización, ordenación de tareas, división y distribución del poder y del presupuesto en los cuerpos legislativos esté constitucionalmente fundamentado en el esquema de los partidos políticos mayoritarios y minoritarios y en las afiliaciones de sus miembros? Si los legisladores se deben sólo al pueblo, ¿cómo justificar entonces el pretendido derecho absoluto (supuestamente inalienable) del Senador Peña Clos a afiliarse al *caucus* del P.N.P.? Según nuestra Constitución: ¿Puede seriamente eliminarse el papel de los partidos políticos en la Asamblea Legislativa?

. Consterna, además, justificar una interpretación de nuestra Carta Magna, a base de ejemplos de políticos que en el pasado cambiaron sus afiliaciones y lealtades. Ninguna de esas situaciones fue objeto de un examen y una interpretación jurídica de acuerdo con nuestra Constitución. Esos ejemplos de políticos no son ni se convierten en buenos precedentes judiciales con el mero pasar del tiempo.

*Hoy el cambio es de minoría a mayoría; como la historia suele repetirse, mañana puede ser al revés.*[12] Imaginemos que esa desafiliación ocurre al comenzar un cuatrienio en que la mayoría senatorial sólo sea de un (1) Senador por distrito o por acumulación. Bajo la sentencia, uno de los senadores de la mayoría podría desafiliarse y con su sola voluntad anular toda la voluntad de un proceso eleccionario. Así trastocaría el mandato de las urnas y convertiría ipso facto y de jure a la minoría en mayoría. Nada

---

[12] Escenario no distante ocurrió en las Elecciones Generales de 1976 que otorgaron al P.N.P. catorce (14) escaños senatoriales y al P.P.D. trece (13).

podrían hacer entonces los tribunales para remediar semejante anomalía electoral.

## VII

El *único "favorecido"* con la decisión mayoritaria de este foro, al menos en este momento, es el P.N.P. *Sin tener derecho, ganan un (1) Senador adicional con oficina, personal y privilegios, financiado todo con fondos públicos.* Su incumbente hará campaña activa en favor del P.N.P., en año eleccionario, desde un escaño legislativo que no le pertenece a ese partido. *Se trata de una nómina de encargo, por no decir de escaso valor ético.*

Al aumentar este Tribunal *inconstitucionalmente* el número total de miembros del Senado, se ha generado un incremento en el presupuesto global operacional de dicho cuerpo legislativo que sólo "beneficia" ahora a la representación mayoritaria del P.N.P., cuyo *caucus* se convierte en más poderoso.

Ello atenta contra el principio de igualdad política y a la larga no beneficia a nadie. " [N]uestro deber judicial darle virtualidad y convertir en realidad el ideal legislativo de igualdad en el debate político. ... Hace mucho tiempo descubrimos que '[l]a igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución. Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones'. *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 633 (1984)." (Énfasis suprimido.) *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 708–709 (1995), opinión concurrente.

Estamos ante un remedio judicial que fomenta la *desventaja económica* en el debate político, *desvirtúa* el *mandato electoral* y favorece a una mayoría, en menoscabo del ideal de igualdad política inmerso en nuestra Constitución.

De igual forma, el aumento, en cuanto al efecto representativo, sólo mejora al *caucus* mayoritario del P.N.P.

*Mientras el número de sus senadores aumenta en uno (1), la minoría del P.P.D. se mantiene igual.* El P.N.P. cuenta ahora con un recurso adicional para representar a dicho sector senatorial en las comisiones del Senado y otras actividades legislativas. Tendrá un senador con una oficina más para atender la ciudadanía y, de ese modo, hacer campaña política en su favor; de hecho, la oficina del licenciado Peña Clos ya aumentó sustancialmente su presupuesto, personal y ubicación física.

Fácil es advertir que la sentencia mayoritaria produce esta gran incongruencia. *No es posible semejante desmerecimiento al sufragio electoral.*

## VIII

Repetimos, ha ganado la *PARTIDOCRACIA* y perdido la *DEMOCRACIA*. El mandato constitucional electoral queda adulterado. Su dinero —fondos públicos— será utilizado para financiar el sueldo, la oficina, el personal y los privilegios de un nuevo legislador *creado a destiempo al margen de la Constitución.*

En *recapitulación*, la certificación original del licenciado Peña Clos fue como *Senador del P.P.D.* Significó poseer el *requisito* de miembro *bona fide* de dicha *colectividad*, creyente de sus postulados ideológicos, *status*, planes sociales, económicos y políticos, según fueron sometidos al electorado. Así se presentó, figuró como candidato del P.P.D. y recibió el endoso de miles de electores, que eventualmente le permitieron obtener el escaño en el Senado en virtud de la disposición constitucional sobre *partidos minoritarios.*

A tono con los fundamentos expuestos, sometemos a la imparcialidad del lector la única interpretación que armoniza el texto y espíritu de la Constitución: el Senador Peña Clos, al *desvincularse* del *caucus* del P.P.D., perdió ese re-

quisito y renunció *ex proprio vigore* a continuar ocupando *cualquier escaño senatorial.*

Mediante sus propios actos —desafiliación del P.P.D. y posterior ingreso al P.N.P., partido de oposición mayoritario— el licenciado Peña Clos *quebrantó la voluntad electoral, la cohesión ideológica con sus compañeros de minoría y el compromiso de representar la filosofía política y el programa del partido bajo cuya insignia fue electo.*

*Su desafiliación e ingreso al P.N.P. es una anomalía que no puede elevarse a categoría de virtud.* Por imperativo constitucional *constituyó una renuncia* que creó una *vacante* perteneciente al P.P.D. No hay razón alguna jurídica ni moral para *judicialmente* crear inconstitucionalmente *otro escaño más* y permitirle continuar como Senador del P.N.P. *Nadie, ni un solo elector, lo eligió para ocupar un escaño de ese partido.*